SLAVIN et al. v. GERMANTOWN FIRE INS. CO. et al.

No. 6564.

District Court, E. D. Pennsylvania.

Nov. 12, 1947.

Murdoch, Paxson, Kalish & Dilworth, C. Richardson Dilworth and James A. Sutton, all of Philadelphia, Pa., for plaintiffs.

C. Brewster Rhoads and Sidney L. Wickenhaver, both of Philadelphia, Pa., for Germantown Fire Ins. Co., Wm. H. Emhardt, Warren R. Humphreys, Edward M. Cushmore, Thomas Evans, Arthur W. Jones, Charles E. Dearnley, Wm. L. Gruhler, Harry E. Baton, Elmer S. Carll, Horace M. Schell and Glenn K. Morris.

Schnader, Kenworthey, Segal & Lewis, Charles E. Kenworthey and Robert M. Blair-Smith, all of Philadelphia, Pa., for Arthur O. Rosenlund.

Harold Evans, of Philadelphia, Pa., for Charles E. Kenworthey, Richard P. Brown and Walter Weir.

Clark, Brown, McCown, Fortenbaugh & Young and Everett H. Brown, Jr., all of Philadelphia, Pa., for National Bank of Germantown & Trust Co.

Guckes, Shrader & Burtt and Howard Burrt, all of Philadelphia, Pa., for Bioren & Co.

Felix & Felix, David H. H. Felix, of Philadelphia, Pa., for Charles Frazier, Charles K. Allman and Miriam S. Felix.

Thomas C. Egan, of Philadelphia, Pa., for Harry P. Gatter, Earle N. Barber, Clifford R. Koelle.

WELSH, District Judge.

This is a stockholders' derivative suit in which the plaintiffs base their cause on alleged violations of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq. There is no diversity of citizenship and jurisdiction is wholly dependent upon the applicability of that Act and the regulations promulgated thereunder.

The Mutual Fire Insurance Company of Germantown, a 100-year old mutual having a surplus of approximately $3,500,000 was converted into a stock company, now called Germantown Fire Insurance Company, by the actions of its policyholders under a plan which provided the policyholders with pre-emptive rights to subscribe to the stock in proportion to the premiums paid. This case grows out of that conversion and the issuance of the stock of the new company.

The plaintiffs are stockholders who seek redress on behalf of the Germantown Fire Insurance Company. The defendants are the new company, directors of the old or mutual company, and Arthur O. Rosenlund, an insurance broker now occupying the positions of President and Chairman of the Board of the new company.

Section 10 of the Act provides that it shall be unlawful for any person, by the use of any instrumentality of interstate commerce, or of the mails, or of the facilities of any national securities exchange, to use or employ, in connection with the purchase or sale of securities, any manipulative or deceptive device or contrivance in contravention of the rules and regulations of the Securities Exchange Commission. Rule X-10B-5 of the Commission declares it unlawful, in securities transactions using such facilities, (1) to employ any device, scheme or artifice to defraud; (2) to make any untrue statement of a material fact or to omit to state a material fact necessary to make expressed statements not misleading; or, (3) to engage in any act or practice which operates or would operate as a fraud or deceit upon any person.

Section 27 of the Act gives to the district courts exclusive jurisdiction of violations of the Act and rules, and of all suits in equity and at law to enforce any liability or duty created by the Act or regulations. Section 29(b) provides that every contract made in violation of the Act and regulations, or the performance of which involves such violations, shall be void as regards the right of any person who shall have made or engaged in the performance of such contract.

The allegations of the bill were deemed sufficient to give preliminary jurisdiction in that they averred the accomplishment of a manipulative device or scheme, dominated and directed by Rosenlund and involving the use of the mails, which resulted in the acquisition of stock at substantially less than its true value. It was alleged that the scheme or device consisted of the transferring of Rosenlund's extensive insurance business to Mutual, inducing his assureds to extend their insurance, placing and controlling Rosenlund's associates, E. M. and C. L. Cushmore, in the key positions re-

spectively of manager and counsel for Mutual, promoting the conversion of Mutual into a stock company in which process false and misleading statements were filed with the S. E. C., obtaining subscription warrants from policyholders by fraudulent representations; and connivance between Rosenlund and the directors for the purpose of enabling Rosenlund to gain control of the new company, and enabling him and the directors to obtain its shares at a mere fraction of their worth. The bill demanded the appointment of a receiver, surrender of the stock issued to Rosenlund and the directors, termination of a voting trust and other agreements, an election of new directors, and general relief.

The evidence submitted at the trial falls short of establishing the comprehensive device or scheme alleged, and the plaintiffs, although still demanding the redress originally prayed for, have modified their theory of recovery. As stated in their brief, they now "seek on behalf of the Company to have restored to the Company the secret profit which Rosenlund and a few directors were able to obtain and did obtain by the misuse of their confidential relationship to the Company in its conversion"; and deem this action one "in the nature of an accounting to compel Rosenlund to turn over to the Company the fruits of the abuse of fiduciary duty", the essential nature of the suit being "to restore to the corporation the profits which they (defendants) obtained through the abuse of their confidential relationship with the Company". The specific relief claimed is the surrender and cancellation of the stock issued to the defendants and the repayment to them of the amount of their subscriptions, with supplemental relief deemed essential to making rescission of the subscriptions effective.

There has been no substantive evidence of the setting up of a device, scheme or artifice to defraud any person by the means and for the purposes alleged in the bill; nor is there any proof that Rosenlund and his alleged conspirators dominated and controlled Mutual and its directors in the process of conversion, or in the filing and distribution of false or incomplete statements and prospectuses through the mails or otherwise. There is no evidence that the directors devised the plan of conversion, fixed the issue price at $20, and filed or issued untrue or incomplete statements or prospectuses with the view to misleading or discouraging subscribers so that the directors could buy the stock at less than its value. To construe the evidence in such light would require the adoption of inferences and suppositions not warranted or justified by the facts.

The evidence upon which the plaintiffs base their demand for recovery, and which we adopt as the basis for our disposition of the principal issues, shows: In the course of the conversion of the company, Rosenlund, its principal broker and business producer, was given full details of the plan of conversion and asked by the company to obtain waivers by certain assureds of their rights to subscribe to stock in excess of 1,000 shares. Rosenlund procured such waivers, and subsequently at the request of the company procured proxies sufficient to enable the company to effect the conversion. In the course of such contacts, and notwithstanding his knowledge that the company planned and sought to limit the holding of stock of any stockholder to 1,000 shares, he obtained from his policyholders agreements to assign their rights to subscribe, and later the warrants themselves.

The method by which he procured those warrants is in some dispute, but is deemed unimportant for present purposes. It seems clear however that Rosenlund concealed or refrained from disclosing to the company his acquisition of the warrants until just prior to the closing of the subscription period, at which time it became known to the company that he had acquired 17,500 of the 50,000 shares authorized. The directors, who were "shocked" to learn of the situation and the defeat of their plan to secure wide distribution of the stock, made an investigation, and with the aid of counsel, concluded that there were no available means of avoiding the issuance of shares to Rosenlund in accordance with the warrants. Shares were issued to Rosenlund for the $20 subscription price, whereas the book value exceeded $80 a share.

There is no substantive evidence of connivance or domination between Rosenlund and the directors or of misleading statements or omissions in the S. E. C. statement and the prospectus mailed to policyholders. The facts on which the plaintiffs rely to establish a breach of fiduciary duty on the part of the directors are, that they failed to discover and prevent Rosenlund's actions in procuring warrants by assignment in contravention of the adopted plan, and upon ultimate discovery the directors failed to take any action to rescind or preclude Rosenlund's rights to the stock represented by the warrants he had acquired; the directors had also made an arrangement with the underwriters of the issue whereby the underwriters would allot to the directors warrants not exercised by the policyholders, and that such directors took advantage of their confidential knowledge and relationship by acquiring stock at $20 which they knew to have a book value greatly in excess thereof.

■ Assuming the existence of the fiduciary relationship of Rosenlund and the directors with Mutual, and that such relationship and all its incidental rights and obligations were carried over to the successor corporation, and conceding for the purpose of demonstration that the facts recited constitute breaches of fiduciary duties of the defendants, the question arises as to whether such breaches are violations of the Act and regulations. In order to construe them as such, and thereby give this court jurisdiction, it must be shown that they constituted a device, scheme, artifice, concealment, practice or course of business which would operate as a fraud or deceit employed in connection with the purchase or sale of securities, and that they involved the use of an instrumentality of interstate commerce, or of the mails, or of a national securities exchange. We may also concede that a party to a purchase or sale made in contravention of the Act impliedly has a right to redress upon proof of injury or damage (Kardon v. National Gypsum Co., D.C., 73 F.Supp. 798); although no direct injury to the company or its policyholders has been shown.

We are unable to discover any use of the designated instrumentalities in the acquisition of the warrants and the subscriptions for the stock in question. Rosenlund's device of concealment by which he deceived the company in regard to the ultimate distribution of shares and by which he precluded the company from altering or abandoning its plan of conversion and stock distribution, notwithstanding any duty to do so, was accomplished without the use of the mails or of any interstate instrumentality or securities exchange.

The alleged breaches of the directors were likewise accomplished without the use of the designated instrumentalities. The only use of the mails involved in the conversion and distribution in this case consisted of the mailing of proxies, prospectuses and subscription warrants, with incidental correspondence, having nothing to do with the purchase of the warrants or the subscriptions to the stock in question, and not in any manner constituting a part of any scheme or device to commit fraud.

The case resolves itself into one in which the plaintiffs, on behalf of the corporation, seek the equitable redress of accounting for unlawful profits acquired by reason of breaches of fiduciary duties owed to it by the defendants. The profits alleged are the differences between the subscription price and the book value of the shares in question; and the demand is that they be restored to the corporation by cancellation of the stock and repayment of the subscription price to the defendants, with the view to the reselling or redistributing of the stock by some method other than the one involved in the conversion and approved by the policyholders, the insurance commissioner and the S. E. C.

The complaint seems to be that Rosenlund took advantage of an inherent weakness in the plan of distribution of stock to the policyholders, (the fact that the warrants were negotiable), concealed from the directors his acquisition of the warrants, and by their exercise placed himself in a position of control in the operation of the company. We can find no artifice, scheme

or fraud in the exercise of the right to subscribe under the warrants acquired and no unlawful use of the mails within our present understanding of the meaning of the Act. The directors likewise knew the advantage of acquiring stock by subscription, although the same information was a matter of common knowledge. They requested and received allotments from the underwriters out of warrants not exercised by the policyholders and at the same price paid by all others. Their action in so doing, even though it might be considered a serious breach of trust under the general principles of equity, was not a violation of the Act unless it be established that it resulted from or was part of a fraudulent scheme or practice employing the mails. No evidence was produced beyond mere inference to establish the existence of any fraudulent device on the part of all or a majority of the directors in setting up the conversion, improperly fixing the par value of the stock, or making an unlawful arrangement with the underwriters. Even if it could be said that they took advantage of the situation by reason of their direct knowledge of circumstances or the fact that they were the promoters of the conversion, or otherwise breached their fiduciary duty, there is no evidence of the use of interstate facilities in the acquisition of the warrants and subscriptions for the stock thereunder.

The evidence leaves little doubt that Rosenlund set out to defeat one of the important and commendable objects of the plan of conversion, for the purpose of serving his own interest and regardless of the interests of the company and its policyholders. Notwithstanding Mr. Rosenlund's ability and his value as a producer in the insurance field, his acquisition of the controlling interest by the methods adopted should not be condoned or commended. In order that our decision at this point in the case may not be considered as such condonation or commendation we feel that frankness requires us to say that the burden cast upon the plaintiffs of proving the lack of morality and ethics on the part of the defendant Rosenlund has been substantially met. The circumstances that the warrants were negotiable, and that the directors were not aware of his actions, made it possible for him to succeed. The evidence however does not indicate that Rosenlund used the mails in the accomplishment of his plans, or that they were used by any other person as part of or in furtherance or promotion of his design.

Any actions of the directors which contributed to the existing circumstances about which the plaintiffs complain were not attributable to any improper motive or to a desire on the part of all or a majority of the directors to gain unconscionable personal advantages to themselves. We find no evidence of collusion between all or a majority of the directors and Rosenlund in the furtherance or accomplishment of the latter's plan, and we believe that most of them were in fact shocked, and possibly somewhat embarrassed, when the ultimate result was realized. Believing that no practical steps could be taken to undo what had been done, the directors set out to make the best of a situation they had hoped to avoid by recognizing Rosenlund's position and engaging his services and ability in the conduct of the business. The propriety of their conduct can be the subject of inquiry by this Court only when it involves the sale or purchase of securities and the use of interstate facilities; and in the absence of such elements all issues having to do with their good faith and the performance of fiduciary duties must be determined by tribunals of general equity jurisdiction.

We are inclined to believe that an action in the nature of an equity suit for an accounting of profits arising out of breach of fiduciary duty, not involving the purchase or sale of securities and the employment of interstate facilities, is not within the jurisdiction of this Court under the Act. If any such action lies it would not be by virtue of the Act in question, and, unless diversity of citizenship exists, this Court is powerless to assume general equity jurisdiction.

## Findings of Fact

The findings of fact upon which our conclusions are based are as follows:

1. The directors of Mutual, after long consideration of methods by which the

surplus could be made available to the benefit of its policyholders, determined to submit a proposal to the policyholders to convert to a stock company.

2. They intended and planned to effect a wide distribution of the stock among policyholders and to preclude the acquisition of large or controlling holdings by any other insurance companies or groups having an adverse interest or by persons who might be interested in causing the liquidation of the company rather than its continued operation. In pursuance thereof the directors desired, as a condition precedent to the promotion of the conversion, to obtain the waivers of large policyholders of their rights to subscribe to more than 1,000 shares under a plan of distribution of shares in proportion to premiums paid.

3. Arthur O. Rosenlund, a broker producing the largest amount of business for the company, was requested by the officers and directors to procure such waivers from his assureds and to tell them of the proposed conversion. Rosenlund procured written waivers from the large policyholders whom he represented and the directors proceeded with their plan of conversion.

4. The directors called a meeting of policyholders and sent notices thereof to policyholders with forms of proxies for those desiring to vote for the conversion at the meeting. Rosenlund was requested to contact the policyholders to procure the execution and return of the proxies, and did obtain a sufficient number to approve and authorize the conversion.

5. The plan of conversion was adopted by the policyholders. It authorized the issuance of warrants to subscribers to the shares at $20 per share. The warrants were negotiable.

6. In the course of contacting assureds for the purpose of procuring the waivers and proxies and informing policyholders of the conversion, Rosenlund obtained from them agreements to assign to him their rights to subscribe to the stock of the new company. When the warrants to subscribe were issued he delivered many of them personally and procured assignments thereof by the assureds.

7. Throughout the process of conversion Rosenlund maintained almost daily contact with E. M. Cushmore, by whom he was informed of the progress of the conversion and the financial condition of the company. Prior to Rosenlund's business dealings with Mutual, Cushmore had been employed by the Pearl Insurance Company, but at the suggestion of Rosenlund became an employee of Mutual, and later manager and director.

8. Notwithstanding his participation in the conversion of the company by procuring waivers and proxies, and his knowledge of his desire of the company to limit the holdings of any shareholder to 1,000 shares, Rosenlund refrained from disclosing to the officers or directors of the company the fact that he had and was procuring assignment of subscription rights until two days before their expiration.

9. Some directors, upon discovery of the acquisition of rights to subscribe to more than 17,500 of the 50,000 shares authorized were shocked and disappointed at the failure of their plan to avoid large stockholdings by any one person. They sought the advice of counsel and made an investigation with the view to discovering how the warrants had been acquired and whether any legal steps could be taken. They and counsel concluded that the warrants had been obtained legally and were binding on the company; the stock was issued to Rosenlund upon payment by him of the subscription price of $20 per share, although the book value exceeded $80.

10. After the new corporation was organized, Rosenlund was elected a director and was, by corporate action, elected president and chairman of the board under a contract to pay him $25,000 a year as chairman plus a percentage of underwriting profits, and waiving his right to brokerage commissions on insurance business.

11. For the purposes of the conversion and the issuance of stock, the officers and directors of Mutual prepared and filed with the S.E.C. a statement of the company, its financial condition and the forms incident to the promotion of the conversion and distribution of warrants, which statements

and data were amended before being finally approved. They also distributed prospectuses of the new company. In such statement it was declared that the intention was to continue the policy of operation and management and to preclude the issuance of warrants for more than 1,000 shares to any policyholder. It was, also declared therein that the subscription price had been fixed at $20, by reason of the requirement of the law limiting the expenses to 10% of the capital.

12. The notice of the meeting of policyholders, prospectuses, proxy forms, and warrants to subscribe were sent out by the company by mail.

13. In pursuance of the policyholders' decision to convert and their authorization, the directors entered into an agreement with Bioren & Company to underwrite the issue of stock, whereby the company undertook to sell so much of the issue as was not subscribed by policyholders upon terms requiring the purchasers of the stock to deposit their shares in a voting trust, with the view to having the voting power of that stock used to continuing the management and policy of the company and to avoid liquidation.

14. The underwriting agreement provided that the distribution of stock by the underwriters was to be within their sole discretion, although a collateral oral understanding was had that the underwriters would so far as possible give preference to policyholders of Mutual. After entering into such arrangement, Rosenlund, Cushmore and some of the officers and directors requested an allotment of such shares to them.

15. Warrants for about 5,200 shares were acquired by Bioren & Company representing rights not exercised by policyholders. Of that number Bioren & Company allotted approximately 1,900 to officers and directors of the company, several hundred to partners and associates, and the remainder to policyholders, brokers and others deemed to have some interest in the company, including 500 to Rosenlund. The latter allotment was with the approval of the officers and directors of the company after they knew of his other acquisitions.

For the purposes of the record, we affirm and adopt the requests of the parties for findings of fact as follows:

Plaintiffs' requests numbers 1–22, 24–26, 29, 30, 34, 36, 38, 40, 44, 52, 53, 60, 62, 63, 67, 68, 71, 72, 75, 76, 79 and 80.

Defendants requests numbers 1–14, 16–20, 22–52, 54–61, 63, 65–83, 85–90, 92–95, 97, 98, 100, 102–109, 111–116, 118–143, 145, 147–152, 154–165, 168–170, 172, 174–177, 179–188;

Defendant Rosenlund's requests numbers 5, 7, 8, 9, 10, 11;

Independent Protective Committee's requests numbers 1-16.

All other requests for findings of fact are refused.

## Conclusions of Law

1. The concealment from the directors of Mutual by Rosenlund that he was acquiring warrants to subscribe to the stock of the new company contrary to the desire of the company as declared in their statement to the S.E.C. and the prospectus was not in violation of the Securities Exchange Act of 1934 and regulations promulgated thereunder.

2. The purchase by the defendant directors of stock in the company was not accomplished by any scheme or device in violation of the Act or regulations.

3. The breach of any fiduciary duty owed by the defendants to the company and giving a right of action to the company did not result from any artifice, scheme, device or practice in contravention of the Act and regulations, nor was any such breach accomplished through the use of any instrumentality of interstate commerce or of the mails, or the facilities of a national securities exchange.

4. This court has no power to exercise its equitable jurisdiction to direct an accounting for breach of the fiduciary duties of officers or agents of a corporation, where it is not shown that the breaches involve the violation of a federal statute or that diversity of the citizenship of the parties exists.

5. Plaintiffs' motion to amend the bill by modification of the prayer should be granted for the purposes of the record.

6. The bill of complaint should be dismissed.

The requests of the parties for conclusions of law are approved and adopted as follows:

Defendants' requests numbers 1, 2, 5, 6, 8–10, 12–14, 16, 17, 20–26, 29, 32, 34, 35, 37, 38, 40–42, 45, 48–62;

Defendant Rosenlund's requests numbers 1, 3, 4, 5, 6, 7, 10, 11;

Independent Protective Committee's requests numbers 1, 2, 3, 5, 6, 7.

All other requests for conclusions of law are refused.

Plaintiffs' motion to amend the bill by modification of the prayer for relief is granted for the purposes of the record, but the bill is dismissed for want of jurisdiction in this court.