**SLAVIN et al. v. GERMANTOWN FIRE INS. CO. et al.**

**FRAZIER et al. v. GERMANTOWN FIRE INS CO. et al.**

Nos. 9568, 9570.

United States Court of Appeals Third Circuit.

Argued June 7, 1948.

Decided April 1, 1949.

BIGGS, Chief Judge, dissenting.

800

Richardson Dilworth, of Philadelphia, Pa. (Harold E. Kohn, James A. Sutton and Murdoch, Paxson, Kalish, Dilworth & Green, all of Philadelphia, Pa., on the brief), for appellants Slavin and others.

David H. H. Felix, of Philadelphia, Pa., for appellants Frazier and others.

Sidney H. Willner, of Washington, D. C. (Roger S. Foster and Alexander Cohen, both of Washington, D. C., on the brief), for Securities and Exchange Commission.

Charles E. Kenworthey, of Pittsburgh, Pa. (Schnader, Kenworthey, Segal & Lewis, of Philadelphia, Pa., of counsel; Wm. A. Schnader and Robert M. Blair-Smith, both of Philadelphia, Pa., on the brief), for defendant-appellee Rosenlund and others.

C. Brewster Rhoads, of Philadelphia, Pa. (Sidney L. Wickenhaver and Montgomery, McCracken, Walker & Rhoads, all of Philadelphia, Pa., on the brief), for defendant-appellee Germantown Fire Ins. Co. and others.

Thomas C. Egan, of Philadelphia, Pa., for Independent Protective Committee.

Before BIGGS, Chief Judge, and GOODRICH and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

This is a shareholders' derivative action based upon Section 10(b) [1] of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and Rule X-10B-5,[2] C.F.R. (Cum. Supp.) Title 17, Section 240.10b-5, promulgated pursuant thereto by the Securities and Exchange Commission, jurisdiction being conferred upon the district courts by Section 27 of the Act, 15 U.S.C.A. § 78aa.

The Germantown Fire Insurance Company ("Germantown"), a stock company organized under the insurance laws of Pennsylvania, became, on or about January 2, 1946, the capitalized successor to the Mutual Fire Insurance Company of Germantown ("Mutual"), a mutual company which, for over a century, had operated under the Pennsylvania insurance laws. The instant controversy arises out of the conversion of the mutual company to the stock company. The force of the plaintiffs' case is chiefly directed against the conduct of one Arthur O. Rosenlund, an independent insurance broker, and the manner in which he became the owner of approximately 17,500 shares of stock in Germantown. It is the contention of the

---

[1] Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j (b), provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

[2] Rule X-10B-5, C.F.R. (Cum.Supp.), Title 17, Section 240.10b-5, provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails \* \* \*

"(1) to employ any device, scheme or artifice to defraud,

"(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

" (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

plaintiffs that Rosenlund, together with one E. M. Cushmore, an officer and director of Mutual, conspired to take advantage of an existing approximate $3,000,000 surplus, by bringing about the conversion; that they succeeded in their design; that when it became apparent to the other officers and directors of Mutual that Rosenlund was in a dominant position, they "went along", making an agreement with him whereby he was to become the senior officer of the new corporation with a salary of $25,000 per annum and a share in the profits; that the aforesaid conduct was in contravention of the specific statutes referred to inasmuch as the designated purpose of the conversion and the methods of bringing it about, as stated in the registration statement filed with the Securities and Exchange Commission and the prospectus mailed to the policyholders of Mutual, were circumvented and falsified; and that the end result constituted a fraud upon Germantown in the sale and purchase of its securities.

The complaint originally included a prayer for the appointment of a receiver for Germantown, but that being withdrawn, the primary relief now sought is cancellation of the stock holdings of Rosenlund and disestablishment of a voting trust containing voluntary stock deposits and deposits required of those who purchased through the stock issue underwriter.[3] Section 29(b)[4] of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78cc (b), is relied upon, as well as general principles of equity. No monetary damage is claimed.

Upon the conclusion of the presentation of evidence by all parties,[5] the Court below dismissed the complaint for want of jurisdiction. It found neither use of the mails within the meaning of the applicable statute and Rule, nor diversity of citizenship to sustain the complaint upon independent grounds in the local law. D.C., 74 F.Supp. 876. It did not give express consideration to the authority of Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, and cases of like import.

To reach the stated result, the District Court made extensive findings of fact wherein the individual defendants other that Rosenlund were absolved of offenses under the Act; the conversion per se was separated from the activities of Rosenlund; and Rosenlund's conduct was found to be outside the Act for want of use of the mails by him in what was assumed, arguendo, to have been a scheme on his part to acquire large holdings in Germantown. The Court, however, expressed the view that Rosenlund had, contrary to good morals, concealed his activities from the officers and directors of Mutual in acquiring such holdings.

On this appeal, the defendants have conceded such a use of the mails as would bring the allegations of the complaint within Section 10(b) of the Securities Exchange Act of 1934, and the Commission's rule X-10B-5. Moreover, they do not take issue over the failure of the Act to explicitly permit civil suits by private persons, nor the failure of the plaintiffs to seek money damages. They do assert, however, that Germantown is not the proper party to sue under the Act. In addition, they contend that no wrong has been done to Germantown, and that, in

---

[3] This latter relief is pressed chiefly by the intervening plaintiffs.

[4] Section 29(b), 15 U.S.C.A. § 78cc (b) provides:

"Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract * * * heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation * * *."

[5] Initially the case was heard on motion for preliminary injunction, but during the course of the trial it was agreed that the scope of the inquiry should be broadened to include the whole case and heard as on final hearing.

general, no actionable fraud or deceit has been committed.

The evidence in the case is voluminous, and a fair summary of all of it would overreach the bounds of necessity. For the purposes of orientation, a basic outline of the framework of the case may be set forth.

Mutual, during its century of existence, had accumulated the $3,000,000 surplus previously mentioned, which was undistributable under the laws of Pennsylvania.[6] On June 21, 1944, Mutual's policyholders authorized conversion to a stock company pursuant to section 534, P.L. 682, May 17, 1921, 40 P.S. § 674, and further authorized the officers and directors of Mutual to take the necessary steps to accomplish that result. The plan contained in the Resolution approved by the policyholders contemplated that the converted company would have a capital of $1,000,000 consisting of 50,000 common shares of a par value of $20, pre-emptive rights to which were to be allotted to policyholders of Mutual of record on May 11, 1944, on the basis of one-tenth of one share for each full dollar of premium paid by term policyholders, and one-tenth of one share for each full ten dollars of perpetual deposit by perpetual policyholders. The 100th annual statement of Mutual's condition, which the policyholders had before them, disclosed assets to the extent of $3,952,043.42, liabilities of $513,235.18, and a surplus of $3,438,808.-24.[7] Thus, it was apparent that with the addition of the proposed $1,000,000 capital to be derived from the sale of stock, the 50,000 shares would have a book value somewhat in excess of $87 per share. It may be noted here that in addition to the proscription in the local law against distribution of the surplus of a mutual company, the surplus, on conversion, was required to remain intact as the surplus of the stock company.[8]

Prior to the action of the policyholders in authorizing the conversion, the officers and directors of Mutual had, in April, 1943, concluded an agreement with Bioren & Co., to underwrite the stock issue for a fee of $30,000, in return for which that firm was to take up, at par, all the stock remaining after the exercise by policyholders of their pre-emptive rights, to deposit such stock in a voting trust, and to resell, at par, voting trust certificates therefor. On June 22, 1944, the voting trust arrangement was completed, with the National Bank of Germantown and Trust Co. as depositary, and with W. H. Emhardt, president and director of Mutual, and A. W. Jones and C. E. Dearnley, directors of Mutual, as trustees. The voting trust was authorized to hold the total issue of stock, but, of course, the number of certificates to be issued depended upon the number of shares deposited.

Although it had been contemplated that the plan would be ready and the warrants distributed shortly after June, 1944, various factors irrelevant here delayed the

---

[6] See 40 P.S. § 677: "The surplus of any domestic mutual fire insurance companies issuing policies in accordance with the provisions of section one or two of this act (40 P.S. §§ 675 and 676) shall be held as a reserve for the payment of losses and expenses; and, in the event of dissolution of the company, shall be divided pro rata among the policyholders whose policies are in force at the time of dissolution, but no policyholder, other than loss claimants, shall receive more than the amount of the unearned cash premium last paid to the company for the current term of such policy. Any balance remaining shall escheat to the Commonwealth of Pennsylvania." And see Mutual Fire Ins. Co. of Germantown v. United States, D.C., 50 F.Supp. 665, affirmed 3 Cir., 1944, 142 F.2d 344, certiorari denied 323 U.S. 729, 65 S.Ct. 65, 89 L.Ed. 585.

[7] The statement of resources disclosed holdings of bonds having par value of $2,-234,101, and market value of $2,332,986.-01; stocks having par value of $192,901, and market value of $211,013; first mortgages valued at $784,748.42; and cash in the amount of $279,387.73. The balance was made up of real estate, real estate investments, deposit notes, agents' balances, accounts receivable, accrued interest receivable, and perpetual insurance deposits on home office buildings.

[8] 40 P.S. § 674: " * * * The policyholders of said company shall have the first right to subscribe to said stock, subject to such equitable regulations as the directors or trustees may prescribe, and the surplus of the mutual company shall not be distributed, but shall remain intact as the surplus of the stock company. * * *"

approval of the State Insurance Department. It was not until about July 5, 1945, that the prospectuses announcing the sale of stock were mailed to policyholders, and about July 9, 1945, that the warrants representing pre-emptive subscription rights were mailed to them. The warrants were effective until September 11, 1945.

The final plan for conversion, as stated in the prospectus, included (1) a regulation adopted by the Board of Directors to the effect that no policyholder would be issued pre-emptive rights entitling him, after proration, to subscribe to more than 1,000 shares of stock; (2) an oral agreement with Bioren & Co.; and (3) a ten-year voting trust.

As revealed in the prospectus, the written underwriting contract with Bioren & Co. did not govern the manner in which it would distribute the voting trust certificates to be issued for the shares it was bound to take up. There was, however, an oral understanding between the Board of Directors and Bioren & Co. that:

"(a) Insofar as appears to the underwriter to be practicable, preference will be given to those policyholders who at the time of exercising their rights have indicated a desire, if possible, to subscribe for additional shares;

"(b) Insofar as the underwriter can control the situation, certificates will not be sold to persons or firms having a substantial interest in competing companies or whose interests are otherwise likely to be adverse to the company; and

"(c) The underwriter will not knowingly distribute certificates in such a way as to make it possible for any individual or firm to obtain control of more than 1000 shares whether or not all or any part of the same shall be represented by voting trust certificates."

With respect to the voting trust, in addition to the details already given, the prospectus stated that under the terms thereof the trustees were prohibited from voting for or approving the dissolution or merger of the company or the sale of all or substantially all of its assets without the unanimous written consent of the certificate-holders. It further stated that the voting trustees "Who are three of the present directors of Mutual Fire Insurance Company of Germantown, including the president of that company and who will occupy similar offices with the new company", intended to use the voting rights to continue the present management of the company for the term of the voting trust agreement. The prospectus also disclosed that Emhardt proposed to acquire, in his own right, voting trust certificates representing 1000 shares of stock, and Jones and Dearnley proposed to acquire 500 shares each, by the exercise of rights which they would receive as policyholders, the purchase of rights or stock on the open market, or the purchase of unsubscribed stock from the underwriter. It further recited that Mutual had never paid any officer a salary in excess of $12,000 per annum, and that under present conditions no substantial change in that policy was contemplated; that the only person who, during the fiscal period ended December 31, 1944, received aggregate remuneration in excess of $20,-000 was Rosenlund, who had received $30,-265.81 in commissions; that the total payments to all of the officers and the directors, including committee fees, "are proposed to be a maximum of $38,500.00 for the first year after reorganization"; and that "No person other than officers or directors will receive compensation from the Company in excess of $12,000 per year" unless earned by way of commissions on insurance placed with the Company.

The warrants as finally issued to the policyholders contained the statement on their face that they were transferable and divisible; that subscriptions to fractions of shares would not be accepted; and that "Warrants to subscribe to fractions of shares must be presented with sufficient additional warrants to make up the number of whole shares subscribed for". On the reverse side of the warrants was an assignment form. In addition, there was a provision, effective unless deleted by the subscriber, authorizing the deposit of the shares subscribed for in the voting trust and the issuance of voting trust certificates in lieu thereof. There was a statement that the organizer of Germantown was Mutual; that the subscription was for stock

in a total issue of 50,000 shares having a par value of $20, all of which would be sold at a price not less than par; and that stock unsubscribed by policyholders would be offered to the general public at par.

On the face of each warrant there was the rubber-stamp legend, "Void unless rider entitled 'Important Amendment' is attached". That "rider" carried, among other things, a "Notice" stating "The right represented by this stock purchase warrant has value. If you do not want to use this warrant for the purpose of subscribing for stock, we suggest that you consult any reputable stock broker". Again, on the reverse side of the warrant, there was another rider calling specific attention to the provision for depositing the stock in the voting trust.

Approximately two days before the expiration date of the warrants, Bioren & Co. received warrants which had been assigned by policyholders to Rosenlund entitling him to subscribe to a total of about 17,000 shares of stock.

Following the completion of the conversion and the effectuation of Germantown, its officers and directors, who had served the same function for Mutual, entered into an agreement with Rosenlund in February, 1946. Pursuant to this agreement, Rosenlund was to become a director and chairman of the Board at a salary of $25,000 per year, plus a share in the profits of the insurance business. He was to manage the production end of the insurance business, and while he was permitted to maintain his independent brokerage business, he was not to receive any commission whatsoever. This contract, which was subject to the action of the stockholders, was read and approved by them at the annual stockholders' meeting in April, 1946, although no mention of it was made in the notice of the meeting. It may be noted, additionally, that in March, 1946, Emhardt had tendered his resignation, which, after conference with him, was accepted as of December 31, 1946, with leave of absence to that time. Upon the effective date of Emhardt's resignation, the Board appointed Rosenlund to fill the position of president without additional compensation until the next stockholders' meeting in April, 1947.

To clarify Rosenlund's relation to Mutual, it should be noted that at no time was he an officer or director of that company. However, commencing with 1942, he was Mutual's largest business producer, and represented its largest policyholders. For this reason, he was able to account for a substantial number of the proxies necessary to the approval of the conversion at the policyholders' meeting in June, 1944.

In view of the allegations of the complaint, the activity of Rosenlund and the manner in which he obtained assignments to so many shares deserve particular attention.

In January, 1943, the insurance committee of Mutual's Board of Directors was considering the matter of the conversion. In connection with the distribution of pre-emptive subscription rights to policyholders, a problem arose with respect to the handling of relatively new assureds who had paid substantial advance premiums. The assured which the committee had in mind was Janney Cylinder Co., Mutual's largest policyholder and Rosenlund's customer. Horace Schell, a member of the Board and the committee, and Mutual's legal counsel, believed that the matter would come within the power granted by statute to the directors to make equitable regulations.[9] Nevertheless, he deemed it so highly desirable that Janney Cylinder agree in advance to waive whatever pre-emptive rights it might have in excess of an amount later to be determined as fair and equitable to all policyholders, that he indicated to management he would not undertake to discuss the conversion with the State Insurance Department unless such waiver were first obtained. He further suggested, inasmuch as it was the custom to deal with policyholders only through their broker, that Janney Cylinder's broker be asked to obtain the waiver. The tentative plans for conversion were accordingly explained to Rosenlund, as well as the reason for the waiver, and he was asked to see whether Janney Cylinder would agree. Rosen-

---

9. See note 8, supra.

lund did obtain such a waiver in January, 1943, and on similar requests, obtained specific waivers, limiting pre-emptive rights to 1000, from two or three of his customers in April, 1943, and April, 1944.

During his discussions with his customers, Rosenlund learned that many were not interested in acquiring insurance company stock. He suggested that they give their rights to him. Between August, 1943, and April 1944, he accumulated agreements from his customers to assign rights when issued. These agreements represented a total of approximately 14,000 shares.

Just prior to the issuance of the warrants, Rosenlund presented to Mutual letters from about 100 of his customers asking that the warrants be delivered to Rosenlund for delivery to them. These requests were complied with,[10] and, in addition, E. M. Cushmore, who was vice-president and general manager of Mutual, as well as in charge of the details of distribution of the warrants, asked Rosenlund to personally delivery warrants to three of the largest policyholders, also Rosenlund's customers.[11]

When the warrants were finally issued, in July, 1945, Rosenlund visited his customers and obtained from them actual assignments of the warrants which, in total, entitled him to subscribe to approximately 17,000 shares. The rights, admittedly acquired gratis by Rosenlund, had a market value ranging from $7 per share, shortly after the issuance, to $15, at the expiration date. He obtained an additional 500 shares in the form of voting trust certificates by purchase at par from Bioren & Co., this number being allotted to him by that firm out of the total of approximately 5,250 shares which were not pre-empted by policyholders and which it therefore took up pursuant to its underwriting contract.

■ As already stated, the defendants do not dispute the failure of the Act to specifically permit private civil litigation for violation of Section 10(b). Logic, and such authority as is available, seem to favor such action despite the absence of enabling legislation.[12] We are content to rest with this observation, for we do not think the ultimate disposition of this controversy necessarily rests upon this point. And if there was a scheme which actually culminated in harm to the corporation and which was effectuated in violation of the provisions of Section 10(b) of the Securities Exchange Act,[13] we have no doubt that the corporation could prosecute the action

---

[10] Prior to delivering these letters, Rosenlund had written to Mutual advising that he held them. Mutual referred the matter for decision to its legal counsel. Rosenlund testified that he obtained assignments from some who had not given him such letters, and that he did not obtain assignments from others who had given him authorization to personally deliver the warrants.

[11] The reason, as testified by Cushmore, was that the warrants were made out to the full number of rights to which these policyholders were entitled, but that they carried the rubber-stamp legend noting that the rights in excess of 1000 could not be exercised, assigned, or otherwise utilized. This, of course, was consistent with the prior waiver, and the regulation which the Board had adopted. Cushmore wanted Rosenlund to explain this to his customers.

[12] Cf. Baird v. Franklin, 2 Cir., 1944, 141 F.2d 238, 244-245 (wherein the Court agreed Section 6(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78f(b), created a duty enforceable in private litigation, but the majority held that on the facts, no damage was traceable to the breach); Speed v. Transamerica Corp., D.C.D.Del.1947, 71 F.Supp. 457; Kardon v. National Gypsum Co., D.C.E.D.Pa.1946, 69 F.Supp. 512; see Notes, Implied Liability Under The Securities Exchange Act, (1948) 61 Harv.L.Rev. 858 (noting the absence of legislative history); New Civil Liabilities Under Securities and Exchange Act Rules, 14 U. of Chi.L.Rev. 471 (1947); and see 14 Minn.L.Rev. 531 (1948).

[13] "Warrants" and "rights to subscribe or purchase" fall within the definition of a "security" in Section 3(a) (10) of the Act, 15 U.S.C.A. § 78c(a) (10). It is interesting to note that under Pennsylvania decisions, a subscription for stock in a corporation to be formed is not a "purchase" or "sale", but a subscription for stock in an existing corporation is: Bole v. Fulton, 1912, 233 Pa. 609, 82 A. 947; Schwartz v. Manufacturers' Casualty Ins. Co., 1939, 335 Pa. 130, 6 A.2d 299, 122 A.L.R. 1045.

for redress; or that in the proper case, a derivative suit may be brought on its behalf.

■ The allegations of the complaint charge that the conversion was a plot engendered by Rosenlund and Cushmore in which the officers and directors of Mutual joined. It is contended that the charges are established by the evidence that Rosenlund, in the summer of 1942, gave Mutual business which exceeded its total premiums from all other sources; that he then cut off that business, and forced the management of Mutual to employ Cushmore, who rapidly advanced from general manager to member of the Board and vice president-general manager, because of Rosenlund's business; that on being placed in charge of the details of the conversion, Cushmore cooperated with Rosenlund for their mutual benefit, and in furtherance of the design procured the employment of his brother, an attorney, to represent Mutual.

The Court below found against these inferences, and we are of the opinion that the evidence would permit no other conclusion. The insurance business of Mutual was confined to the writing of smaller policies on dwellings and small shops in the Germantown area. Its chief source of revenue and profit came from investment of its huge surplus, but with business stagnating, Mutual was developing into a "dry" trust, since the surplus was undistributable. The officers and directors were keenly aware of this situation, and at least as early as the beginning of 1941, had submitted to Schell, its counsel, the problem of benefiting policyholders through distribution of dividends. Having embarked upon an exploration of this problem, the Board considered various possibilities until, upon the advice and insistence of its counsel, it determined that the outstanding solution was to take advantage of the local statute permitting conversion to a stock company.[14] Having made this decision, the Board also authorized Schell to employ associate counsel, specifying the law firm it desired, a member of which was Cushmore's brother.

The record discloses that Mutual first learned of E. M. Cushmore through Rosenlund, although it does not definitely appear that he was employed, in the fall of 1941, solely through Rosenlund's recommendation. The uncontradicted evidence is that in the summer of 1941, Rosenlund, who represented industrial concerns in chief, gave Mutual some of his business at the behest of a special agent of the company. After about two months he discovered that Mutual was not properly equipped to handle his type of business and therefore he placed it as he had previously done. The company, however, was desirous of retaining its new business, and asked Rosenlund to suggest someone it might employ. Rosenlund suggested Cushmore, with whom he came in contact in the course of placing his business with the Pearl Assurance Co. Following his employment by Mutual, Cushmore sought Rosenlund's business, and obtained it.

The officers and directors of Mutual were clear in their testimony that Rosenlund exercised no influence or control over them in their decision to convert, or in their effectuation of that decision, and there is nothing in the record to justify an inference to the contrary.

The record also affords no basis for inferring that the officers and directors of Mutual entered into an arrangement with Rosenlund to permit him to subscribe to shares so that together they would have control, and to make him head of Germantown. The evidence is that upon learning of the exercise by Rosenlund of rights assigned to him by policyholders, Mutual's Board, "shocked" or "surprised", investigated not merely the manner in which he obtained the assignments, but also the assignments themselves to determine their validity. A full disclosure of the circum-

---

[14] A report submitted by Schell suggested the alternative of participating policies or conversion. From the beginning, Schell opposed the former; but in early 1942, the Board decided upon it. Upon the further advice of Schell, in the fall of 1942, it rescinded the Resolution to submit the issuance of participating policies to its policyholders and authorized exploration of the matter of conversion. In April, 1943, the Board did authorize proceeding with the conversion.

stances surrounding his acquisition was made by Rosenlund to the Board's committee and reported by the committee to the Board on October 5, 1945. On the advice of counsel, the Board concluded that he had acted within his rights. The management contract to which we have referred, relating exclusively to the production phase of the business, was arranged as a result of bargaining, both parties being represented by counsel; the Board, through its executive committee took the initiative as part of its desire to revitalize and expand its insurance business.

While the salary was larger than that indicated as the intention of Mutual in the prospectus,[15] nevertheless Germantown's officers and directors considered it appropriate in view of the fact that between March 1, 1942, and March 1, 1946, Rosenlund's commissions for insurance placed with Mutual averaged approximately $27,000 per year net. The Board took into consideration that Rosenlund was the company's largest business producer, and it desired to have the advantage of his ability in this respect as well as his experience. For the purposes of this case, it is enough to hold that there was no connection between the negotiation of the employment agreement and any deceitful conduct of Rosenlund in the acquisition of stock, and, accordingly, there is no occasion to con-

sider the rights, if any, conferred on the corporation under Section 10(b) of the Act of 1934, and Rule X-10B-5.

Dominating the plaintiffs' general argument are references to fraud committed by Rosenlund upon his assignors, and the creation, by Rosenlund, of a situation making statements in the prospectus false. With respect to the former, obviously the right of redress, if any, belongs to the assignors,[16] and not to the corporation. With respect to the latter, similarly, the right of redress, if any, would seem to belong to those who purchased the securities.[17]

The conclusions reached considerably narrow the scope of the complaint against Rosenlund. At this point, plaintiffs' position is that in accumulating pre-emptive subscription rights Rosenlund frustrated the aim of the conversion to benefit the policyholders, and in the concealment thereof prevented the officers and directors of Mutual from taking steps to revise the plan to assure a more equitable distribution of stock among Mutual's policyholders and a wide distribution of the stock in general; and that Rosenlund, by the device of concealment, was enabled to make a secret profit and unjustly enrich himself at the expense of Germantown. It is contended that the claim comes within Section 10(b) of the Act of 1934 and Rule X-

---

[15] See footnote 17, infra.

[16] In Norris Tool & Machine Co. v. Rosenlund, 1947, 355 Pa. 560, 50 A.2d 273, one of Rosenlund's assignors unsuccessfully sought to recover from Rosenlund on grounds of local law.

[17] The issue of stock here involved was registered with the Securities and Exchange Commission pursuant to the requirements of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq. Aside from criminal penalties, Section 11 of the Act, 15 U.S.C.A. § 77k, affords a specific remedy for omissions, or untrue statements, of material facts in the registration statement to "any person acquiring such security" without knowledge of the untruth or omission. Section 10(a) of the Securities Act of 1933, 15 U.S.C.A. § 77j (a), requires the same statements in the prospectus as are required in the registration statement, with the exception of copies of certain documents. Section 7,

15 U.S.C.A. § 77g, requires that the registration statement include the information specified in Schedule A, 15 U.S. C.A. § 77aa. Section 12 of the Act, 15 U.S.C.A. § 77l, provides a similar remedy to the purchaser against any person who sells a security, under certain conditions, by means of a prospectus or oral communication which includes an omission, or untrue statement, of material fact. Section 17(a), 15 U.S.C.A. § 77q (a) makes it unlawful to accomplish the sale of securities in such a manner as to operate as a deceit or fraud upon the purchaser. These provisions undeniably give a right of action to the purchaser of such securities, and a "spurious" class suit is maintainable. Independence Shares Corp. v. Deckert, 3 Cir., 1939, 108 F.2d 51, reversed on other grounds 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189. But they afford no right of action to the corporation here inasmuch as it was not a purchaser.

10B-5 because Rosenlund violated his fiduciary obligations as an agent.[18]

Leaving aside the conclusion that much of the complaint alleges causes of action enforceable by others than the corporation, and assuming that Rosenlund was a stranger to the conversion, it is difficult to see that his conduct caused harm to the corporation.

The prospectus did suggest that there was a fair distribution of subscription rights to policyholders entitled to them; to assure such a distribution, and to prevent large policyholders from becoming entitled to subscribe to large blocks of stock,[19] a regulation had been adopted limiting to 1000 the rights to be issued to any single policyholder. This, however, relates to the rights to which policyholders were automatically entitled by virtue of their policies, and cannot be construed as a limitation upon the number of rights which a policyholder, or a stranger, might otherwise acquire on the market. No other inference is possible in the face of statements in the prospectus that the warrants were transferable and that the company could not know who the subscribers would be; that no stock was to be issued in fractional amounts, and that holders of fractional warrants should secure additional rights on the market.[20]

The statements in the prospectus relating to the oral agreement with Bioren & Co. and to the voting trust merely indicate that the officers and directors of Mutual had given consideration to the possibility that stock might be accumulated, and that they had taken what steps they could to diminish the possibility while affording the policyholders an opportunity, in the form of the voting trust, to counter-balance any such accumulation.

The argument that the aim of the conversion, to benefit the policyholders, was frustrated by Rosenlund, fails to meet the answer that all the policyholders received the rights to which they were entitled. The fact that some did not want to avail themselves of those rights and chose instead to exercise their alternative right to sell them, or give them away, does not mean that they were not benefited,[21] or that others did not receive their fair share. There was no statement in the prospectus limiting the right of any person to subscribe to 1000 shares, and, accordingly, the corporation is not in a position to assert that the issuance of stock in excess of 1000 shares was invalid.

■ Similarly, we think nothing is gained by the assertion that Rosenlund acquired the stock at a price lower than the book value, or its market value, particularly in view of the failure of the evidence to establish that he had anything to do with the fixing of the price at which the stock was to be sold. The quarrel, in reality, is not with the price Rosenlund and others paid, but with the price fixed in the conversion plan.[22] Since Rosenlund paid for the stock the full cash price at which it was

---

[18] See Note, SEC Action Against Fraudulent Purchasers of Securities, 59 Harv.L.Rev. 769 (1946).

[19] The District Court adopted such a finding of fact upon the request of the defendants. (Defendant's Request for Findings of Fact, No. 74.)

[20] The plaintiff Slavin, according to the complaint, was entitled to rights to subscribe to ½ share of stock. She obtained 199½ on the market. The plaintiff Talens, according to the complaint, purchased on the market the rights to subscribe to 17 shares of stock. The intervening plaintiffs do not allege that they had been policyholders of Mutual.

[21] Cf. Willock v. Dilworth, 1903, 204 Pa. 492, 54 A. 278. Where the issue of stock was illegal, and the right to preempt was not accorded stockholders, a cause of action might rest either in the stockholders as individuals, or in the corporation. See Shellenberger v. Patterson, 1895, 168 Pa. 30, 31 A. 943; Electric Co. v. Edison Electric Illuminating Co., 1901, 200 Pa. 516, 50 A. 164; Glenn v. Kittanning Brewing Co., 1918, 259 Pa. 510, 103 A. 340, L.R.A.1918D, 738, Ann.Cas.1918D, 769. In Shellenberger v. Patterson it was also held that the stockholder cannot complain where it appears that no stockholder offered to take or was willing to take the stock at par, or that it would have sold for more.

[22] The plaintiffs contended in the court below that the par value of the stock was fraudulently fixed at a price too high to permit policyholders to buy, yet low enough to permit the officers, directors, and Rosenlund, to afford large amounts, emphasis being placed on the local requirement that the capital of the

offered to both policyholders and the public, no wrong to the corporation is made out on that score. In this respect, the cases [23] discussing secret profits realized by the promoters, agents, officers and directors in their dealings with the corporate entity are inapposite.

■ With the contention that Rosenlund was an agent, plaintiffs introduce a substantially different approach to the case. On settled principles of agency, there is no necessity to make out a wrong, or loss, to the principal. Restatement of the Law of Agency, Section 388; and see Pennsylvania Annotations thereto. And it is immaterial that the agent's services were gratuitous. Restatement, Section 387, Comment c. The agency relationship, in this case, between Rosenlund and Mutual is based primarily upon the evidence that Rosenlund was asked to procure waivers from his customers. Reference is also had to his activity with respect to the proxies in connection with the policyholders' meeting in June, 1944. And it is claimed that his duties as an agent were violated in failing to inform the directors that his customers were not interested in purchasing stock and in failing to inform them of the fact that he obtained agreements to assign the warrants if issued.

In September, 1945, the officers and directors of Mutual became aware, as it was inevitable they would, of the total amount of Rosenlund's subscription. And in October, 1945, they were fully apprised by Rosenlund of the circumstances under which he secured the right to make the subscription in that amount. Thus, any deceit, concealment, or breach of duty was known to the officers and directors of Mutual, prior to, and in sufficient time, to prevent the fruition of Rosenlund's alleged scheme.[24] It is to state the obvious to say that there is no deceit where all the relevant facts are known before the acts in completion of the deceit are executed. Similarly, where the agent discloses all relevant facts before completion of the transaction complained of, he has satisfied his duty. See Restatement of the Law of Agency, Section 392. Finally, the officers and directors, acting in good faith, investigated the circumstances surrounding Rosenlund's acquisition of rights to subscribe, and, on the advice of counsel, concluded that he had violated no duty.

The instant case is not similar to Bailey v. Jacobs, 1937, 325 Pa. 187, 189 A. 320, where a director made use of corporate assets for his own profit, a matter which the officers and directors could not ratify, and the latter were held to have become parties to the illegal transaction, especially since they attempted to ratify and in doing so made an entry on the corporate books in such form as to constitute a concealment. It more nearly approaches Chambers v. Chambers & McKee Glass Co., 1898, 185 Pa. 105, 39 A. 822, in which a stockholder was held bound by the action of the Board in the absence of fraud and intentional disregard of the interests of the stockholders, despite the fact that the action was detrimental to the corporation.

---

new corporation could be fixed as low as $100,000. 40 P.S. § 386(b). The explanation, however, is that, on advice of counsel, the capitalization was fixed at $1,000,000 on the basis of a local requirement that the expenses of the promotion, which here were approximately $80,000, could not exceed 10% of the capital. 40 P.S. Section 392.

The Securities and Exchange Commission, which has filed a brief as amicus, suggests that the officers and directors of Mutual were negligent in not preserving assets by prescribing a higher price for the securities to the public. But the availability of a better plan is no indication of fraud or breach of fiduciary duty. United Milk Products Corp. v. Lovell, 6 Cir., 1935, 75 F.2d 923, 927, certiorari denied 295 U.S. 751, 55 S.Ct. 831, 79 L.Ed. 1696. The court is a harbor of refuge, not a repair shop. Even if it be assumed that the policyholders would not have approved the plan had they known of Rosenlund's conduct, it was clearly not the price of the securities that caused the wrong. Moreover the suggestion, it may be observed, does not fit well on the particular plaintiffs in this case: see note 20, supra.

[23] Fletcher on Corporations (Perm. Ed.) Sections 193, 194.

[24] Cf. Berwick Hotel Co. v. Vaughn, 1938, 300 Pa. 389, at page 396, 150 A. 613, 71 A.L.R. 1340, holding that the creation of a new corporation is inchoate until the articles of the corporation are filed.

For the reasons stated we are of the opinion that the plaintiffs failed to establish a cause of action against the defendants and that the latter were entitled to judgment by the Court below. Inasmuch as the Court below erroneously dismissed the action for want of jurisdiction its order will be reversed and the cause remanded with direction to enter judgment for the defendants in accordance with this opinion.

BIGGS, Chief Judge, (dissenting).

The court below dismissed the complaint upon the ground that there was no basis for federal jurisdiction. See D.C., 74 F. Supp. 876, 883. There is ample uncontradicted evidence, however, to support the conclusion that notices of the meeting of the policyholders, proxy forms, prospectuses and subscription warrants were distributed through the United States mails.

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), makes it unlawful for any person, directly or indirectly, by use of the mails to employ " * * * any manipulative or deceptive device or contrivance * * *" in contravention of such regulations as the Commission may prescribe as necessary in the public interest.[1] Rule X-10B-5, adopted by the Commission under Section 10(b), C.F.R. (Cum.Supp.) Title 17, § 240.10b-5, makes it unlawful for any person to employ any scheme to defraud or to make any untrue statement of a material fact or omit to state a material fact, in order not to mislead, or to engage in any course which would operate as a fraud on any person in connection with the purchase or sale of any security.[2]

The record demonstrates the following. The Mutual Fire Insurance Company of Germantown (Mutual) had achieved a surplus amounting to about $3,400,000. The directors decided to convert Mutual into a stock company and thought it desirable, lest some rival company or group should seize control and effect liquidation or not continue the successful policies of the organization, that there should be a wide distribution of the stock and that no person or small group of persons should be permitted to gain control of the new company. The directors decided that they would effect this while giving policyholders pre-emptive subscription rights in proportions to the premiums paid by them,[3] by obtaining from large policyholders, Rosenlund's clients, waivers of their rights to subscribe to more than 1,000 shares each. Obtaining such waivers was deemed by the directors of Mutual to be a condition precedent to properly effecting the conversion.[4] That it was such is demonstrated by the fact that the prospectus of the new company, Germantown Fire Insurance Company, filed with the Securities and Exchange Commission on May 29, 1944 pursuant to the Securities Act of 1933, 15 U.

---

[1] Section 10 of the Securities Exchange Act provides in pertinent part:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

* * * * * *

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

[2] Rule X-10B-5 of the Securities and Exchange Commission provides in pertinent part:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails,

* * * * * *

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

[3] See 40 P.S.Pa. §§ 674, 677.

[4] See finding of fact No. 2.

S.C.A. § 77a et seq., stated that "The three largest policyholders of the Mutual Fire Insurance Company of Germantown [Mutual] have entered into an agreement with the Board of Directors of that Company that they will not exercise their pre-emptive rights to subscribe to the extent of more than 1,000 shares each * * *"[5] and is proven also by the fact that the stock purchase warrants issued to large policyholders on July 9, 1945 had stamped upon them at the top the legend, "By special agreement the rights represented by this certificate are limited to not more than 1,000 shares after proration."[6]

Rosenlund was aware of the condition precedent decided upon by the directors as an essential element of the plan of Mutual and was fully conversant with what the directors of Mutual hoped to achieve by the conversion.[7] While the plan of conversion was still in the discussion stage among Mutual's directors, as far back as January 1943, three years before the conversion was consummated and over a year before Mutual's directors on March 14, 1944 voted the resolution proposing the conversion, Rosenlund already had entered into a written agreement with one of his clients for an assignment of that policyholder's right to subscribe for stock. From August, 1943, until April 26, 1944, Rosenlund procured from various policyholders assignments of stock rights amounting altogether to more than 15,000 shares. Of these over 12,000 were assigned to him prior to April, 1944.[8, 9, 10]

Rosenlund was requested by Mutual's directors some time prior to April, 1944, to procure waivers from his large clients of their pre-emptive rights to subscribe to stock in excess of 1,000 shares each. In April, 1944, though on dates not clear from the record, Rosenlund reported that he had procured waivers from his respective large clients, waivers which necessarily had to be procured if the condition precedent of limited stock ownership laid down by the directors was to be achieved. He informed Mutual's directors that he had procured the waivers but he failed to tell them then of his acquisition of the assignments. The directors, unaware of this cogent circumstance, proceeded to put into motion the machinery for effecting the conversion. Proxies were mailed to the policyholders in April, 1944. The prospectus was filed with the Commission, as stated, on May 29, 1944. A resolution approving the conversion was adopted by two-thirds of the policyholders as required by law on June 21, 1944. Copies of the prospectus were mailed to policyholders on July 5, 1945 and stock purchase warrants were mailed to policyholders on July 9, 1945, the rights to subscribe expiring (by subsequent authorized amendment) on September 11, 1945. On September 9, 1945, two days before the expiration date of the warrants, Rosenlund informed Mutual's directors that he had procured assignments of the warrants which, as we have stated, gave him the ownership of about 17,000 shares of the 50,000 shares of stock of the new company to be created by the conversion. The directors, "shocked" and "disappointed" by the failure of their plan to avoid large concentrations of the stock of the new company but advised by counsel that the warrants had been legally obtained by Rosenlund, decided to consummate the plan of conversion and did so.[11]

Throughout the critical period from July 9, 1945 until the end of the first week

---

[5] Subject to an exception not here pertinent. See Plaintiffs' Exhibit 17.

[6] See Plaintiffs' Exhibit 16, the subscription blank issued to Reliance Bronze & Aluminum Foundry, Inc., one of the largest policyholders and Rosenlund's client.

[7] See finding of fact No. 8.

[8] See Plaintiff's Exhibit No. 42, at pp. 1883-4 of the transcript.

[9] In this connection it is interesting to note that the form for the assignment was prepared for Rosenlund in January of 1943 by C. L. Cushmore, whose brother was vice-president and general manager of Mutual.

[10] See finding of fact No. 3.

[11] A time table of the events which transpired follows:

January, 1943. Rosenlund, assisted by C. L. Cushmore, had prepared and had printed forms for the assignment of stock of the new company which was to be created by the conversion.

January, 1943. Rosenlund procured his first written assignment of stock.

August, 1943, to April 1944. Rosenlund procured assignments for approxi-

of the following September Rosenlund was in almost daily contact with E. M. Cushmore, a director of Mutual, who was in the confidential position of manager of Mutual, as to the progress of the steps leading to the conversion and the financial condition of the company. E. M. Cushmore was the brother of C. L. Cushmore, hereinbefore referred to. It is unnecessary to relate in full the part which Bioren & Co., the underwriter, dismissed as a party defendant, played in the conversion. It is sufficient to state that Bioren & Co. acquired about 5,200 shares of stock of which it allotted approximately 1900 to directors of Mutual, several hundred more to partners or associates and the remainder to certain interested parties, including 500 to Rosenlund. The latter allotment was made with the approval of the officers and directors of Mutual after they were aware of Rosenlund's earlier acquisitions.[12] When the conversion had been completed Rosenlund had acquired stock which was worth about one million dollars more than he had paid for it and the working control of the new company, and was elected its president at a salary of $25,000 a year plus a percentage of the underwriting profits.[13] As indicated some of the directors of Mutual had also profited to some extent by the acquisition of the stock of the new company.

The suit at bar has some of the characteristics of a stockholders' derivative action to recover for the corporation the stock which Rosenlund acquired and it is this fact which I feel has misled the majority. On the record it is clear that Rosenlund was acting as an agent for Mutual to procure the waivers by the large policyholders of their preemptive rights to subscribe to stock in excess of 1,000 shares each. Rosenlund was false to his trust and captured the new company with the acquiescence of at least a majority of the directors of Mutual but this is beside the point. The majority of this court are of the opinion that no recovery is possible by the new corporation because Rosenlund paid to it the full cash price at which its stock was offered to the policyholders and to the public; in other words, that the new corporation cannot recover because it has received the full dollar value to which it was entitled. The majority are also of the view that the policyholders received all the rights to which they were entitled and therefore they can claim no damage. I am of the opinion that the cause of action stated in the complaint and the proof will sustain a stockholders' derivative suit based on the well known equitable principle of breach of trust by an agent and that it is not necessary to rely on the Securities and Exchange Act of 1934 for jurisdiction, even though diversity is absent. See Hurn v. Oursler, 289 U.S. 238, 245-246, 53 S.Ct. 586, 77 L.Ed. 1148. The majority of this court obviously entertain the contrary view and this particular aspect of the case need not be discussed further in this dissenting

---

mately 14,000 shares of the stock of the new company.

March 14, 1944. The plan of conversion was approved by resolution of Mutual's board of directors.

April, 1944. Rosenlund was given duty of procuring waivers from his large clients of pre-emptive rights in excess of 1,000 shares each.

April, 1944. Rosenlund informed the directors on divers dates that he had procured waivers of his large clients' pre-emptive rights and failed to inform the directors that he had procured assignments of the stock in his own favor.

April, 1944. Proxies were mailed to the policyholders and Rosenlund was entrusted with the task of seeing that they were executed.

May 29, 1944. The prospectus was filed with the Commission.

June 21, 1944. Policyholders approved the plan of conversion by a two-thirds vote.

July 5, 1945. Copies of the prospectus were mailed to policyholders.

July 9, 1945. Stock purchase warrants were mailed to policyholders, the rights to subscribe expiring on September 11, 1945.

September 9, 1945. Rosenlund informed the directors that he had procured assignments of stock from policyholders including his own clients.

January 2, 1946. Conversion consummated.

March, 1946. Rosenlund was elected a director, chairman of the board of directors of Germantown and its president.

[12] See finding of fact No. 15.

[13] The stock which Rosenlund acquired at $20 a share had a book value of about $80 a share.

opinion. It is clear that the right of the new corporation, Germantown, qua corporation as distinguished from its stockholders, to maintain a suit such as that at bar does not stand or fall on the issue of whether or not there was some breach of fiduciary duty by Rosenlund. The right of the corporation to maintain a suit such as that at bar arises under the statute and the rule of the Commission. If Rosenlund's course of conduct was prohibited by the statute and the rule, the corporation could maintain the suit at bar. We must turn therefore to the statute and to the rule in order to determine Rosenlund's liability.

Rosenlund's conduct falls within the prohibitions of subparagraphs (a), (b) and (c) of Rule X-10B-5. But whether or not subparagraphs (a) or (c) be employed to test his actions it is clear that both what he did and failed to do is within the purview of subparagraph (b). Rosenlund knew that it was the express intention of Mutual and of its directors to obtain waivers of subscription rights from his large clients. Rosenlund was aware that it was a condition precedent to the promotion of the conversion and an integral part thereof as conceived by the directors of Mutual and by its policyholders (see the provisions of the prospectus and the legend upon the stock purchase warrants, notes 6 and 7, supra) that there should be no large concentrations of stock. This was a part of the plan of conversion despite the fact that the desideratum of the proposed limitation of ownership was not achieved due to Rosenlund's deceitful course of conduct. The limitation of stock ownership was a matter of great concern to the directors and to the policyholders and it cannot be doubted that it was an element of importance which influenced the decisions of the directors and the policyholders to proceed with the plan. It cannot be doubted therefore that the limitation was "material"[14] to the plan. When Rosenlund re-ported that he had procured the waivers the directors and the policyholders then proceeded with the promotion of the conversion. After the stock purchase warrants and the copies of the prospectus had been mailed it would have been difficult to have withdrawn the plan of conversion. When the directors discovered, two days prior to the expiration date of the stock purchase warrants, that Rosenlund had procured the assignments of stock in his favor it would have been impossible to have withdrawn the plan of conversion, at least without the intervention of a court of equity.

Neither the directors nor the policyholders knew at any of the points of time designated in the preceding paragraph that Rosenlund had procured assignments of warrants from his clients which enabled him, subsequently, to circumvent the important feature of limited stock ownership. Rosenlund's failure to inform the directors and policyholders that he had procured the assignments was "material" to his statement that he had procured the waivers from his clients for both directors and policyholders would have considered[15] most carefully the question as to whether or not the plan of conversion should be proceeded with when a large concentration of stock in the hands of one man, Rosenlund, had become inevitable. Perhaps they would have concluded nonetheless to proceed with the conversion, though this is to be doubted, but surely they would have deemed a timely revelation by Rosenlund that he had circumvented the design of limited stock ownership as highly relevant to the course which Mutual should pursue in respect to the conversion.

Therefore, I cannot doubt but that Rosenlund's course of conduct was within the prohibitions of subparagraph (b) of Rule X-10B-5, if he be deemed a "person" within the purview of the Act. Rosenlund was a "person" under the definition of Section 3(a) (9), 15 U.S.C.A. § 78c(a)

[14] The word "materiality" may be defined as: "The property of substantial importance or influence, especially as distinguished from formal requirement." See 2 Bouv. Law Dict., Rawle's Third Revision, p. 2121.

[15] In support of this statement it should be pointed out that some of the directors, upon later discovery of Rosenlund's acquisition of rights to subscribe to more than 17,000 shares of stock, consulted counsel to find some way to avoid his stock ownership. See finding of fact No. 9.

(9). To repeat to some extent, perhaps needlessly, the right of the corporation to maintain a suit such as that at bar against Rosenlund is not to be based upon any agency or fiduciary relationship between Rosenlund and Mutual, though such relationships existed. The Act has eliminated agency or fiduciary relationship, so necessary for the maintenance of the ordinary stockholders' derivative suit, as a basis for the kind of action at bar. The statute and the rule of the Commission create a new offense, hitherto unknown to the law and set the standard of conduct required of those who are connected with the sale or purchase of securities, assuming arguendo that the use of the mails was such as to be within the purview of Section 10(b) of the Act.

That the United States mails were used in connection with the execution of the plan of conversion is not open to doubt,[16] albeit Rosenlund himself, insofar as the record shows, made no use of the mails. But this is not necessary to sustain jurisdiction in the court below and to constitute the offense. The use of the mails by Mutual, its officers and agents, was enough to bring Rosenlund into a position where he is hit by the statute and the rule. A persuasive analogy is supplied by the application of the Mail Fraud Statute, Section 338 of Title 18 U.S.C. 1940 ed., now Section 1341 of revised Title 18 U.S.C.A. The mailing of stock certificates has been held to be sufficient use of the mails to bring a defendant within the purview of the criminal statute, Landay v. United States, 6 Cir., 108 F.2d 698, 701 [17] and the mailing by an innocent third party, as a natural and probable consequence of the acts of a defendant, suffices to lay the crime at the door of the latter, United States v. Kenofskey, 243 U.S. 440, 443, 37 S.Ct. 438, 61 L.Ed. 836. A fortiori the mailing of the material referred to in the twelfth finding of fact (see note 16, supra) was sufficient to confer jurisdiction of the suit at bar on the court below. See Sec-

tion 27 of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78aa.

The remedy in the instant case is supplied by Section 29(b) of the Act, 15 U.S.C.A. § 78cc(b), which provides that any contract made in violation of the Act or of the rules of the Commission promulgated thereunder shall be void. The warrants which Rosenlund procured and by which he obtained his stock in the new company fall within the ambit of this section though the warrant contracts have been executed. Rosenlund should not be permitted to retain the benefit of his illegal contracts. His stock should be cancelled. Section 29 does not expressly give a remedy to a private person injured by a violation of Section 10(b) of the Act. But as was well stated by Judge Kirkpatrick in Kardon v. National Gypsum Co., D.C.E.D.Pa., 69 F. Supp. 512, 513, under circumstances analogous to those at bar,[18] while "It is * * true that there is no provision in Sec. 10 or elsewhere expressly allowing civil suits by persons injured as a result of violation of Sec. 10 or of * * * [Rule X-10B-5]. However, 'The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if; (a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and (b) the interest invaded is one which the enactment is intended to protect * * *' Restatement, Torts, Vol. 2, Sec. 286. This rule is more than merely a canon of statutory interpretation. The disregard of the command of a statute is a wrongful act and a tort. As was said in Texas & Pacific R. Co. v. Rigsby, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874, 'This is but an application of the maxim, Ubi jus ibi remedium.' " See also the same case on final hearing at D.C., 73 F.Supp. 798. The same principle was invoked in Remar v. Clayton Securities Corporation, D.C.D.Mass., 81 F.Supp. 1014. Cf. Downing v. Howard, 3 Cir., 162 F.2d 654, 658.

---

[16] See finding of fact No. 12.

[17] See also Kopald-Quinn & Co. v. United States, 5 Cir., 101 F.2d 628, 632-633.

[18] In the cited case certain defendants were accused of violating the provisions of Section 10(b) of the Act and of Rule X-10B-5, in conspiring to induce the plaintiffs to sell their stock in two corporations for less than its true value.

Cf. note 11 cited to the text in United States v. Silliman, 3 Cir., 167 F.2d 607, 611. See Baird v. Franklin, 2 Cir., 141 F. 2d 238, 244-246; Goldstein v. Groesbeck, 2 Cir., 142 F.2d 422, 426-427, 154 A.L.R. 1285. See 61 Harvard Law Review 858, 865-6. The remedy supplied by Section 29(b), like the other remedies supplied by the Act, is federal in origin, and, in view of the foregoing authorities, must be construed broadly so that it may be availed of by an injured private person. It follows that if a cause of action, as I think to be the case, is set up by the complaint the court below has power to grant the relief sought.

I do not think that the right or the remedy should be cramped into a narrow concept of fraud or deceit. See Stewart v. Wyoming Cattle Ranche Co., 128 U.S. 383, 388, 9 S.Ct. 101, 32 L.Ed. 439. Cf. Berle, "Stock Market Manipulation", 38 Columbia Law Review 393, 398. Restrictive interpretation of the Act has been rejected. See Speed v. Transamerica Corp., D.C.Del., 71 F.Supp. 457, 458, and Charles Hughes & Co. v. Securities and Exchange Commission, 2 Cir., 139 F.2d 434, 437. Both the right and remedy created by the federal statute are new. I conclude therefore that the application of subparagraph (b) of Rule X-10B-5 should not be limited in the instant case by the test of whether or not Rosenlund's course of conduct would sustain a common law action of fraud or deceit. As already stated I do not doubt but that the new company would be entitled to maintain a suit against Rosenlund of the nature of the action at bar.

The instant suit, however, was brought by two stockholders, Slavin and Talens. Slavin was a policyholder of Mutual and as such purchased prior to September 9, 1945 from Germantown under a stock purchase warrant sent to her by the company ½ share of stock. She also acquired 199½ shares of stock by purchase of stock pur-chase warrants in the open market but the date of this purchase does not appear from the complaint, the answer thereto, from any findings of fact made by the court below, and I have found nothing in the voluminous record which would aid in ascertaining the date.[19] Talens is the owner of 17 shares of stock which he acquired by purchase of stock purchase warrants between July 9, 1945 and September 9, 1945,[20] and by the purchase of 8/10 of a share of stock in the open market. The date of the last purchase cannot be found in the record.

The court below held that only Slavin was qualified as a party plaintiff under Rule 23(b), Federal Rules of Civil Procedure, 28 U.S.C.A. to maintain the action,[21] finding as a conclusion of law that "Charles Talens is not entitled to complain of any matter or thing occurring prior to September 9, 1945." It is clear that Slavin has the right to maintain the suit but I think that the court below was in error in concluding that Talens is not also entitled to sustain the action. The theory of the court below apparently was that Talens bought his way into the litigation after the occurrence of the acts complained of. But Rosenlund never made disclosure of his conduct until September 9, 1945, two days before the expiration of the stock purchase warrants. Rosenlund's course of conduct must be construed as a continuing one and on September 9 it had not been completed. Rosenlund's plans did not come to fruition until he had acquired the stock of Germantown and actual control of the company, all of which came to pass after September 9, 1945. But viewing the circumstances most narrowly, any purchaser of stock purchase warrants should be entitled to maintain the suit if he made his purchase prior to September 9, 1945 without knowledge of Rosenlund's prior conduct. Rule 23(b) should not be construed narrowly where the wrong alleged and

---

[19] See paragraph 4 of the complaint, paragraph 4 of the answer, and defendant Germantown's request for finding No. 184, found by the court below.

[20] See paragraph 5 of the complaint, paragraph 5 of the answer and defendant Germantown's request for finding No. 185, found by the court below.

[21] See defendant Germantown's requests for conclusions of law Nos. 1 and 2, found by the court below.

proved is a continuing one, extending over a long period, and has not been consummated at the time of the purchase.

Though I can find no case directly in point which sustains the use of the device of the stockholders' derivative suit brought to assert a cause of action arising under the Securities Exchange Act of 1934 under circumstances identical with those at bar, nonetheless the decision of the Court of Appeals for the Second Circuit in Goldstein v. Groesbeck, supra, supplies a helpful analogy. There is no logical reason where, as here, the corporation will not pursue [22] the cause of action granted to it by a federal statute, stockholders may not maintain a suit for the benefit of the corporation in the time-honored way. It is necessary, at most, only to fit the right and remedy created by the Act into the framework of a stockholder's secondary suit. The status of the plaintiffs qua stockholders must of course be determined by the law of Pennsylvania since both Mutual and the new corporation were created under the law of that State. Under that law the plaintiffs are stockholders. The law of Pennsylvania does not run beyond this point in the instant case.

The federal act here sub judice is a remedial one. It is entitled to a broad construction. The precise aspects of it now before this court present novel questions not heretofore presented, insofar as I am aware, to any court of appeals. For this reason the instant litigation is of great importance in the effective administration of the Securities Exchange Act of 1934. The construction put upon the statute by the majority seems to me to defeat the purpose of the statute and to render it ineffective. I would reverse the court below, reinstate the complaint, and order the cancellation of Rosenlund's stock, voiding the employment contract between him and Germantown. I would also declare the voting trust a nullity to the end that Germantown's stockholders might be reenfranchised and Rosenlund's control of the corporation done away with.

---

[22] Germantown actively opposes the relief set by the plaintiffs. See its brief filed in this court on April 6, 1948 and observe its position in the court below.