(Slip Opinion)  OCTOBER TERM, 2007  1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## STONERIDGE INVESTMENT PARTNERS, LLC *v.* SCIENTIFIC-ATLANTA, INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 06–43.  Argued October 9, 2007—Decided January 15, 2008

Alleging losses after purchasing Charter Communications, Inc., common stock, petitioner filed suit against respondents and others under §10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission (SEC) Rule 10b–5.  Acting as Charter's customers and suppliers, respondents had agreed to arrangements that allowed Charter to mislead its auditor and issue a misleading financial statement affecting its stock price, but they had no role in preparing or disseminating the financial statement.  Affirming the District Court's dismissal of respondents, the Eighth Circuit ruled that the allegations did not show that respondents made misstatements relied upon by the public or violated a duty to disclose.  The court observed that, at most, respondents had aided and abetted Charter's misstatement, and noted that the private cause of action this Court has found implied in §10(b) and Rule 10b–5, *Superintendent of Ins. of N. Y.* v. *Bankers Life & Casualty Co.*, 404 U. S. 6, 13, n. 9, does not extend to aiding and abetting a §10(b) violation, see *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 191.

*Held:* The §10(b) private right of action does not reach respondents because Charter investors did not rely upon respondents' statements or representations.  Pp. 5–16.

(a) Although *Central Bank* prompted calls for creation of an express cause of action for aiding and abetting, Congress did not follow this course.  Instead, in §104 of the Private Securities Litigation Reform Act of 1995 (PSLRA), it directed the SEC to prosecute aiders and abettors.  Thus, the §10(b) private right of action does not extend to aiders and abettors.  Because the conduct of a secondary actor

must therefore satisfy each of the elements or preconditions for §10(b) liability, the plaintiff must prove, as here relevant, reliance upon a material misrepresentation or omission by the defendant. Pp. 5–7.

(b) The Court has found a rebuttable presumption of reliance in two circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. *Affiliated Ute Citizens of Utah* v. *United States*, 406 U. S. 128, 153–154. Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. Neither presumption applies here: Respondents had no duty to disclose; and their deceptive acts were not communicated to the investing public during the relevant times. Petitioner, as a result, cannot show reliance upon any of respondents' actions except in an indirect chain that is too remote for liability. P. 8.

(c) Petitioner's reference to so-called "scheme liability" does not, absent a public statement, answer the objection that petitioner did not in fact rely upon respondents' deceptive conduct. Were the Court to adopt petitioner's concept of reliance—*i.e.,* that in an efficient market investors rely not only upon the public statements relating to a security but also upon the transactions those statements reflect—the implied cause of action would reach the whole marketplace in which the issuing company does business. There is no authority for this rule. Reliance is tied to causation, leading to the inquiry whether respondents' deceptive acts were immediate or remote to the injury. Those acts, which were not disclosed to the investing public, are too remote to satisfy the reliance requirement. It was Charter, not respondents, that misled its auditor and filed fraudulent financial statements; nothing respondents did made it necessary or inevitable for Charter to record the transactions as it did. The Court's precedents counsel against petitioner's attempt to extend the §10(b) private cause of action beyond the securities markets into the realm of ordinary business operations, which are governed, for the most part, by state law. See, *e.g., Marine Bank* v. *Weaver*, 455 U. S. 551, 556. The argument that there could be a reliance finding if this were a common-law fraud action is answered by the fact that §10(b) does not incorporate common-law fraud into federal law, see, *e.g., SEC* v. *Zandford*, 535 U. S. 813, 820, and should not be interpreted to provide a private cause of action against the entire marketplace in which the issuing company operates, cf. *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 733, n. 5. Petitioner's theory, moreover, would put an unsupportable interpretation on Congress' specific response to *Central Bank* in PSLRA §104 by, in substance, reviving the implied cause of

action against most aiders and abettors and thereby undermining Congress' determination that this class of defendants should be pursued only by the SEC. The practical consequences of such an expansion provide a further reason to reject petitioner's approach. The extensive discovery and the potential for uncertainty and disruption in a lawsuit could allow plaintiffs with weak claims to extort settlements from innocent companies. See, *e.g., Blue Chip, supra,* at 740–741. It would also expose to such risks a new class of defendants—overseas firms with no other exposure to U. S. securities laws—thereby deterring them from doing business here, raising the cost of being a publicly traded company under U. S. law, and shifting securities offerings away from domestic capital markets. Pp. 8–13.

(d) Upon full consideration, the history of the §10(b) private right of action and the careful approach the Court has taken before proceeding without congressional direction provide further reasons to find no liability here. The §10(b) private cause of action is a judicial construct that Congress did not direct in the text of the relevant statutes. See, *e.g., Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U. S. 350, 358–359. Separation of powers provides good reason for the now-settled view that an implied cause of action exists only if the underlying statute can be interpreted to disclose the intent to create one, see, *e.g., Alexander* v. *Sandoval,* 532 U. S. 275, 286–287. The decision to extend the cause of action is thus for the Congress, not for this Court. This restraint is appropriate in light of the PSLRA, in which Congress ratified the implied right of action after the Court moved away from a broad willingness to imply such private rights, see, *e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 381–382, and n. 66. It is appropriate for the Court to assume that when PSLRA §104 was enacted, Congress accepted the §10(b) private right as then defined but chose to extend it no further. See, *e.g., Alexander, supra*, at 286–287. Pp. 13–15.

443 F. 3d 987, affirmed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER and GINSBURG, JJ., joined. BREYER, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 06–43

_____

## STONERIDGE INVESTMENT PARTNERS, LLC, PETITIONER *v.* SCIENTIFIC-ATLANTA, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[January 15, 2008]

JUSTICE KENNEDY delivered the opinion of the Court.

We consider the reach of the private right of action the Court has found implied in §10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, as amended, 15 U. S. C. §78j(b), and SEC Rule 10b–5, 17 CFR §240.10b–5 (2007). In this suit investors alleged losses after purchasing common stock. They sought to impose liability on entities who, acting both as customers and suppliers, agreed to arrangements that allowed the investors' company to mislead its auditor and issue a misleading financial statement affecting the stock price. We conclude the implied right of action does not reach the customer/supplier companies because the investors did not rely upon their statements or representations. We affirm the judgment of the Court of Appeals.

I

This class-action suit by investors was filed against Charter Communications, Inc., in the United States District Court for the Eastern District of Missouri. Stoneridge Investment Partners, LLC, a limited liability com-

pany organized under the laws of Delaware, was the lead
plaintiff and is petitioner here.

Charter issued the financial statements and the securi-
ties in question. It was a named defendant along with
some of its executives and Arthur Andersen LLP, Char-
ter's independent auditor during the period in question.
We are concerned, though, with two other defendants,
respondents here. Respondents are Scientific-Atlanta,
Inc., and Motorola, Inc. They were suppliers, and later
customers, of Charter.

For purposes of this proceeding, we take these facts,
alleged by petitioner, to be true. Charter, a cable operator,
engaged in a variety of fraudulent practices so its quar-
terly reports would meet Wall Street expectations for cable
subscriber growth and operating cash flow. The fraud
included misclassification of its customer base; delayed
reporting of terminated customers; improper capitaliza-
tion of costs that should have been shown as expenses; and
manipulation of the company's billing cutoff dates to
inflate reported revenues. In late 2000, Charter execu-
tives realized that, despite these efforts, the company
would miss projected operating cash flow numbers by \$15
to \$20 million. To help meet the shortfall, Charter decided
to alter its existing arrangements with respondents, Sci-
entific-Atlanta and Motorola. Petitioner's theory as to
whether Arthur Andersen was altogether misled or, on the
other hand, knew the structure of the contract arrange-
ments and was complicit to some degree, is not clear at
this stage of the case. The point, however, is neither
controlling nor significant for our present disposition, and
in our decision we assume it was misled.

Respondents supplied Charter with the digital cable
converter (set top) boxes that Charter furnished to its
customers. Charter arranged to overpay respondents \$20
for each set top box it purchased until the end of the year,
with the understanding that respondents would return the

overpayment by purchasing advertising from Charter. The transactions, it is alleged, had no economic substance; but, because Charter would then record the advertising purchases as revenue and capitalize its purchase of the set top boxes, in violation of generally accepted accounting principles, the transactions would enable Charter to fool its auditor into approving a financial statement showing it met projected revenue and operating cash flow numbers. Respondents agreed to the arrangement.

So that Arthur Andersen would not discover the link between Charter's increased payments for the boxes and the advertising purchases, the companies drafted documents to make it appear the transactions were unrelated and conducted in the ordinary course of business. Following a request from Charter, Scientific-Atlanta sent documents to Charter stating—falsely—that it had increased production costs. It raised the price for set top boxes for the rest of 2000 by $20 per box. As for Motorola, in a written contract Charter agreed to purchase from Motorola a specific number of set top boxes and pay liquidated damages of $20 for each unit it did not take. The contract was made with the expectation Charter would fail to purchase all the units and pay Motorola the liquidated damages.

To return the additional money from the set top box sales, Scientific-Atlanta and Motorola signed contracts with Charter to purchase advertising time for a price higher than fair value. The new set top box agreements were backdated to make it appear that they were negotiated a month before the advertising agreements. The backdating was important to convey the impression that the negotiations were unconnected, a point Arthur Andersen considered necessary for separate treatment of the transactions. Charter recorded the advertising payments to inflate revenue and operating cash flow by approximately $17 million. The inflated number was shown on

financial statements filed with the Securities and Ex-
change Commission (SEC) and reported to the public.

Respondents had no role in preparing or disseminating
Charter's financial statements. And their own financial
statements booked the transactions as a wash, under
generally accepted accounting principles. It is alleged
respondents knew or were in reckless disregard of Char-
ter's intention to use the transactions to inflate its reve-
nues and knew the resulting financial statements issued
by Charter would be relied upon by research analysts and
investors.

Petitioner filed a securities fraud class action on behalf
of purchasers of Charter stock alleging that, by participat-
ing in the transactions, respondents violated §10(b) of the
Securities Exchange Act of 1934 and SEC Rule 10b–5.

The District Court granted respondents' motion to dis-
miss for failure to state a claim on which relief can be
granted. The United States Court of Appeals for the
Eighth Circuit affirmed. *In re Charter Communications,
Inc., Securities Litigation*, 443 F. 3d 987 (2006). In its
view the allegations did not show that respondents made
misstatements relied upon by the public or that they
violated a duty to disclose; and on this premise it found no
violation of §10(b) by respondents. *Id.*, at 992. At most,
the court observed, respondents had aided and abetted
Charter's misstatement of its financial results; but, it
noted, there is no private right of action for aiding and
abetting a §10(b) violation. See *Central Bank of Denver,
N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S.
164, 191 (1994). The court also affirmed the District
Court's denial of petitioner's motion to amend the com-
plaint, as the revised pleading would not change the
court's conclusion on the merits. 443 F. 3d, at 993.

Decisions of the Courts of Appeals are in conflict re-
specting when, if ever, an injured investor may rely upon
§10(b) to recover from a party that neither makes a public

misstatement nor violates a duty to disclose but does participate in a scheme to violate §10(b).  Compare *Simpson* v. *AOL Time Warner Inc.*, 452 F. 3d 1040 (CA9 2006), with *Regents of Univ. of Cal.* v. *Credit Suisse First Boston (USA), Inc.*, 482 F. 3d 372 (CA5 2007).  We granted certiorari.  549 U. S. \_\_\_ (2007).

## II

Section 10(b) of the Securities Exchange Act makes it

> "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U. S. C. §78j.

The SEC, pursuant to this section, promulgated Rule 10b–5, which makes it unlawful

> "(a)  To employ any device, scheme, or artifice to defraud,
>
> "(b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> "(c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> "in connection with the purchase or sale of any security."  17 CFR §240.10b–5.

Rule 10b–5 encompasses only conduct already prohibited by §10(b).  *United States* v. *O'Hagan*, 521 U. S. 642, 651

(1997). Though the text of the Securities Exchange Act does not provide for a private cause of action for §10(b) violations, the Court has found a right of action implied in the words of the statute and its implementing regulation. *Superintendent of Ins. of N. Y.* v. *Bankers Life & Casualty Co.*, 404 U. S. 6, 13, n. 9 (1971). In a typical §10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. See *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U. S. 336, 341–342 (2005).

In *Central Bank*, the Court determined that §10(b) liability did not extend to aiders and abettors. The Court found the scope of §10(b) to be delimited by the text, which makes no mention of aiding and abetting liability. 511 U. S., at 177. The Court doubted the implied §10(b) action should extend to aiders and abettors when none of the express causes of action in the securities Acts included that liability. *Id.,* at 180. It added the following:

> "Were we to allow the aiding and abetting action proposed in this case, the defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions. See also *Chiarella* [v. *United States*, 445 U. S. 222, 228 (1980)]. Allowing plaintiffs to circumvent the reliance requirement would disregard the careful limits on 10b–5 recovery mandated by our earlier cases." *Ibid.*

The decision in *Central Bank* led to calls for Congress to create an express cause of action for aiding and abetting within the Securities Exchange Act. Then-SEC Chairman Arthur Levitt, testifying before the Senate Securities Subcommittee, cited *Central Bank* and recommended that aiding and abetting liability in private claims be estab-

lished. S. Hearing No. 103–759, pp. 13–14 (1994). Congress did not follow this course. Instead, in §104 of the Private Securities Litigation Reform Act of 1995 (PSLRA), 109 Stat. 757, it directed prosecution of aiders and abettors by the SEC. 15 U. S. C. §78t(e).

The §10(b) implied private right of action does not extend to aiders and abettors. The conduct of a secondary actor must satisfy each of the elements or preconditions for liability; and we consider whether the allegations here are sufficient to do so.

## III

The Court of Appeals concluded petitioner had not alleged that respondents engaged in a deceptive act within the reach of the §10(b) private right of action, noting that only misstatements, omissions by one who has a duty to disclose, and manipulative trading practices (where "manipulative" is a term of art, see, *e.g., Santa Fe Industries, Inc.* v. *Green*, 430 U. S. 462, 476–477 (1977)) are deceptive within the meaning of the rule. 443 F. 3d, at 992. If this conclusion were read to suggest there must be a specific oral or written statement before there could be liability under §10(b) or Rule 10b–5, it would be erroneous. Conduct itself can be deceptive, as respondents concede. In this case, moreover, respondents' course of conduct included both oral and written statements, such as the backdated contracts agreed to by Charter and respondents.

A different interpretation of the holding from the Court of Appeals opinion is that the court was stating only that any deceptive statement or act respondents made was not actionable because it did not have the requisite proximate relation to the investors' harm. That conclusion is consistent with our own determination that respondents' acts or statements were not relied upon by the investors and that, as a result, liability cannot be imposed upon respondents.

A

Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the §10(b) private cause of action. It ensures that, for liability to arise, the "requisite causal connection between a defendant's misrepresentation and a plaintiff's injury" exists as a predicate for liability. *Basic Inc.* v. *Levinson*, 485 U. S. 224, 243 (1988); see also *Affiliated Ute Citizens of Utah* v. *United States*, 406 U. S. 128, 154 (1972) (requiring "causation in fact"). We have found a rebuttable presumption of reliance in two different circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. *Id.,* at 153–154. Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement. *Basic, supra*, at 247.

Neither presumption applies here. Respondents had no duty to disclose; and their deceptive acts were not communicated to the public. No member of the investing public had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times. Petitioner, as a result, cannot show reliance upon any of respondents' actions except in an indirect chain that we find too remote for liability.

B

Invoking what some courts call "scheme liability," see, *e.g.*, *In re Enron Corp. Securities, Derivative, & "ERISA" Litigation*, 439 F. Supp. 2d 692, 723 (SD Tex. 2006), petitioner nonetheless seeks to impose liability on respondents even absent a public statement. In our view this approach does not answer the objection that petitioner did not in

fact rely upon respondents' own deceptive conduct.

Liability is appropriate, petitioner contends, because respondents engaged in conduct with the purpose and effect of creating a false appearance of material fact to further a scheme to misrepresent Charter's revenue. The argument is that the financial statement Charter released to the public was a natural and expected consequence of respondents' deceptive acts; had respondents not assisted Charter, Charter's auditor would not have been fooled, and the financial statement would have been a more accurate reflection of Charter's financial condition. That causal link is sufficient, petitioner argues, to apply *Basic*'s presumption of reliance to respondents' acts. See, *e.g., Simpson*, 452 F. 3d, at 1051–1052; *In re Parmalat Securities Litigation*, 376 F. Supp. 2d 472, 509 (SDNY 2005).

In effect petitioner contends that in an efficient market investors rely not only upon the public statements relating to a security but also upon the transactions those statements reflect. Were this concept of reliance to be adopted, the implied cause of action would reach the whole marketplace in which the issuing company does business; and there is no authority for this rule.

As stated above, reliance is tied to causation, leading to the inquiry whether respondents' acts were immediate or remote to the injury. In considering petitioner's arguments, we note §10(b) provides that the deceptive act must be "in connection with the purchase or sale of any security." 15 U. S. C. §78j(b). Though this phrase in part defines the statute's coverage rather than causation (and so we do not evaluate the "in connection with" requirement of §10(b) in this case), the emphasis on a purchase or sale of securities does provide some insight into the deceptive acts that concerned the enacting Congress. See Black, Securities Commentary: The Second Circuit's Approach to the 'In Connection With' Requirement of Rule 10b–5, 53 Brooklyn L. Rev. 539, 541 (1987) ("[W]hile the 'in connec-

tion with' and causation requirements are analytically
distinct, they are related to each other, and discussion of
the first requirement may merge with discussion of the
second"). In all events we conclude respondents' deceptive
acts, which were not disclosed to the investing public, are
too remote to satisfy the requirement of reliance. It was
Charter, not respondents, that misled its auditor and filed
fraudulent financial statements; nothing respondents did
made it necessary or inevitable for Charter to record the
transactions as it did.

The petitioner invokes the private cause of action under
§10(b) and seeks to apply it beyond the securities mar-
kets—the realm of financing business—to purchase and
supply contracts—the realm of ordinary business opera-
tions. The latter realm is governed, for the most part, by
state law. It is true that if business operations are used,
as alleged here, to affect securities markets, the SEC
enforcement power may reach the culpable actors. It is
true as well that a dynamic, free economy presupposes a
high degree of integrity in all of its parts, an integrity that
must be underwritten by rules enforceable in fair, inde-
pendent, accessible courts. Were the implied cause of
action to be extended to the practices described here,
however, there would be a risk that the federal power
would be used to invite litigation beyond the immediate
sphere of securities litigation and in areas already gov-
erned by functioning and effective state-law guarantees.
Our precedents counsel against this extension. See *Ma-
rine Bank* v. *Weaver*, 455 U. S. 551, 556 (1982) ("Congress,
in enacting the securities laws, did not intend to provide a
broad federal remedy for all fraud"); *Santa Fe*, 430 U. S.,
at 479–480 ("There may well be a need for uniform federal
fiduciary standards . . . . But those standards should not
be supplied by judicial extension of §10(b) and Rule 10b–5
to 'cover the corporate universe'" (quoting Cary, Federal-
ism and Corporate Law: Reflections Upon Delaware, 83

Yale L. J. 663, 700 (1974))). Though §10(b) is "not 'limited to preserving the integrity of the securities markets,'" *Bankers Life*, 404 U. S., at 12, it does not reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way.

These considerations answer as well the argument that if this were a common-law action for fraud there could be a finding of reliance. Even if the assumption is correct, it is not controlling. Section 10(b) does not incorporate common-law fraud into federal law. See, *e.g., SEC* v. *Zandford*, 535 U. S. 813, 820 (2002) ("[Section 10(b)] must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation"); *Central Bank*, 511 U. S., at 184 ("Even assuming . . . a deeply rooted background of aiding and abetting tort liability, it does not follow that Congress intended to apply that kind of liability to the private causes of action in the securities Acts"); see also *Dura,* 544 U. S., at 341. Just as §10(b) "is surely badly strained when construed to provide a cause of action . . . to the world at large," *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 733, n. 5 (1975), it should not be interpreted to provide a private cause of action against the entire marketplace in which the issuing company operates.

Petitioner's theory, moreover, would put an unsupportable interpretation on Congress' specific response to *Central Bank* in §104 of the PSLRA. Congress amended the securities laws to provide for limited coverage of aiders and abettors. Aiding and abetting liability is authorized in actions brought by the SEC but not by private parties. See 15 U. S. C. §78t(e). Petitioner's view of primary liability makes any aider and abettor liable under §10(b) if he or she committed a deceptive act in the process of providing assistance. Reply Brief for Petitioner 6, n. 2; Tr. of Oral Arg. 24. Were we to adopt this construction of §10(b), it would revive in substance the implied cause of action

against all aiders and abettors except those who committed no deceptive act in the process of facilitating the fraud; and we would undermine Congress' determination that this class of defendants should be pursued by the SEC and not by private litigants. See *Alexander* v. *Sandoval*, 532 U. S. 275, 290 (2001) ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others"); *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 143 (2000) ("At the time a statute is enacted, it may have a range of plausible meanings. Over time, however, subsequent acts can shape or focus those meanings"); see also *Seatrain Shipbuilding Corp.* v. *Shell Oil Co.*, 444 U. S. 572, 596 (1980) ("[W]hile the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, such views are entitled to significant weight, and particularly so when the precise intent of the enacting Congress is obscure" (citations omitted)).

This is not a case in which Congress has enacted a regulatory statute and then has accepted, over a long period of time, broad judicial authority to define substantive standards of conduct and liability. Cf. *Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U. S. ___, ___ (2007) (slip op., at 19–20). And in accord with the nature of the cause of action at issue here, we give weight to Congress' amendment to the Act restoring aiding and abetting liability in certain cases but not others. The amendment, in our view, supports the conclusion that there is no liability.

The practical consequences of an expansion, which the Court has considered appropriate to examine in circumstances like these, see *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U. S. 1083, 1104–1105 (1991); *Blue Chip,* 421 U. S., at 737, provide a further reason to reject petitioner's approach. In *Blue Chip*, the Court noted that extensive discovery and the potential for uncertainty and

disruption in a lawsuit allow plaintiffs with weak claims to extort settlements from innocent companies. *Id.,* at 740–741. Adoption of petitioner's approach would expose a new class of defendants to these risks. As noted in *Central Bank,* contracting parties might find it necessary to protect against these threats, raising the costs of doing business. See 511 U. S., at 189. Overseas firms with no other exposure to our securities laws could be deterred from doing business here. See Brief for Organization for International Investment et al. as *Amici Curiae* 17–20. This, in turn, may raise the cost of being a publicly traded company under our law and shift securities offerings away from domestic capital markets. Brief for NASDAQ Stock Market, Inc., et al. as *Amici Curiae* 12–14.

C

The history of the §10(b) private right and the careful approach the Court has taken before proceeding without congressional direction provide further reasons to find no liability here. The §10(b) private cause of action is a judicial construct that Congress did not enact in the text of the relevant statutes. See *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson,* 501 U. S. 350, 358–359 (1991); *Blue Chip, supra,* at 729**.** Though the rule once may have been otherwise, see *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 432–433 (1964), it is settled that there is an implied cause of action only if the underlying statute can be interpreted to disclose the intent to create one, see, *e.g., Alexander, supra,* at 286–287; *Virginia Bankshares, supra,* at 1102; *Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 575 (1979). This is for good reason. In the absence of congressional intent the Judiciary's recognition of an implied private right of action

> "necessarily extends its authority to embrace a dispute Congress has not assigned it to resolve. This runs contrary to the established principle that '[t]he

jurisdiction of the federal courts is carefully guarded
against expansion by judicial interpretation . . . ,'
*American Fire & Casualty Co.* v. *Finn*, 341 U. S. 6, 17
(1951), and conflicts with the authority of Congress
under Art. III to set the limits of federal jurisdiction."
*Cannon* v. *University of Chicago*, 441 U. S. 677, 746
(1979) (Powell, J., dissenting) (citations and footnote
omitted).

The determination of who can seek a remedy has signifi-
cant consequences for the reach of federal power. See
*Wilder* v. *Virginia Hospital Assn.*, 496 U. S. 498, 509, n. 9
(1990) (requirement of congressional intent "reflects a
concern, grounded in separation of powers, that Congress
rather than the courts controls the availability of remedies
for violations of statutes").

Concerns with the judicial creation of a private cause of
action caution against its expansion. The decision to
extend the cause of action is for Congress, not for us.
Though it remains the law, the §10(b) private right should
not be extended beyond its present boundaries. See *Vir-
ginia Bankshares, supra*, at 1102 ("[T]he breadth of the
[private right of action] once recognized should not, as a
general matter, grow beyond the scope congressionally
intended"); see also *Central Bank, supra*, at 173 (deter-
mining that the scope of conduct prohibited is limited by
the text of §10(b)).

This restraint is appropriate in light of the PSLRA,
which imposed heightened pleading requirements and a
loss causation requirement upon "any private action"
arising from the Securities Exchange Act. See 15 U. S. C.
§78u–4(b). It is clear these requirements touch upon the
implied right of action, which is now a prominent feature
of federal securities regulation. See *Merrill Lynch, Pierce,
Fenner & Smith Inc.* v. *Dabit*, 547 U. S. 71, 81–82 (2006);
*Dura*, 544 U. S., at 345–346; see also S. Rep. No. 104–98,

p. 4–5 (1995) (recognizing the §10(b) implied cause of action, and indicating the PSLRA was intended to have "Congress . . . reassert its authority in this area"); *id.,* at 26 (indicating the pleading standards covered §10(b) actions). Congress thus ratified the implied right of action after the Court moved away from a broad willingness to imply private rights of action. See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 381–382, and n. 66 (1982); cf. *Borak*, *supra*, at 433. It is appropriate for us to assume that when §78u–4 was enacted, Congress accepted the §10(b) private cause of action as then defined but chose to extend it no further.

## IV

Secondary actors are subject to criminal penalties, see, *e.g.,* 15 U. S. C. §78ff, and civil enforcement by the SEC, see, *e.g.,* §78t(e). The enforcement power is not toothless. Since September 30, 2002, SEC enforcement actions have collected over $10 billion in disgorgement and penalties, much of it for distribution to injured investors. See SEC, 2007 Performance and Accountability Report, p. 26, http://www.sec.gov/about/secpar2007.shtml (as visited Jan. 2, 2008, and available in Clerk of Court's case file). And in this case both parties agree that criminal penalties are a strong deterrent. See Brief for Respondents 48; Reply Brief for Petitioner 17. In addition some state securities laws permit state authorities to seek fines and restitution from aiders and abettors. See, *e.g.,* Del. Code Ann., Tit. 6, §7325 (2005). All secondary actors, further-more, are not necessarily immune from private suit. The securities statutes provide an express private right of action against accountants and underwriters in certain circumstances, see 15 U. S. C. §77k, and the implied right of action in §10(b) continues to cover secondary actors who commit primary violations. *Central Bank, supra*, at 191.

Here respondents were acting in concert with Charter in

the ordinary course as suppliers and, as matters then evolved in the not so ordinary course, as customers. Unconventional as the arrangement was, it took place in the marketplace for goods and services, not in the investment sphere. Charter was free to do as it chose in preparing its books, conferring with its auditor, and preparing and then issuing its financial statements. In these circumstances the investors cannot be said to have relied upon any of respondents' deceptive acts in the decision to purchase or sell securities; and as the requisite reliance cannot be shown, respondents have no liability to petitioner under the implied right of action. This conclusion is consistent with the narrow dimensions we must give to a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law.

The judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

───────────

No. 06–43

───────────

## STONERIDGE INVESTMENT PARTNERS, LLC, PETITIONER *v.* SCIENTIFIC-ATLANTA, INC., ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[January 15, 2008]

JUSTICE STEVENS, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, dissenting.

Charter Communications, Inc., inflated its revenues by $17 million in order to cover up a $15 to $20 million expected cash flow shortfall. It could not have done so absent the knowingly fraudulent actions of Scientific-Atlanta, Inc., and Motorola, Inc. Investors relied on Charter's revenue statements in deciding whether to invest in Charter and in doing so relied on respondents' fraud, which was itself a "deceptive device" prohibited by §10(b) of the Securities Exchange Act of 1934. 15 U. S. C. §78j(b). This is enough to satisfy the requirements of §10(b) and enough to distinguish this case from *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164 (1994).

The Court seems to assume that respondents' alleged conduct could subject them to liability in an enforcement proceeding initiated by the Government, *ante,* at 15, but nevertheless concludes that they are not subject to liability in a private action brought by injured investors because they are, at most, guilty of aiding and abetting a violation of §10(b), rather than an actual violation of the statute. While that conclusion results in an affirmance of the judgment of the Court of Appeals, it rests on a rejec-

tion of that court's reasoning. Furthermore, while the Court frequently refers to petitioner's attempt to "expand" the implied cause of action,[1]—a conclusion that begs the question of the contours of that cause of action—it is today's decision that results in a significant departure from *Central Bank*.

The Court's conclusion that no violation of §10(b) giving rise to a private right of action has been alleged in this case rests on two faulty premises: (1) the Court's overly broad reading of *Central Bank*, and (2) the view that reliance requires a kind of super-causation—a view contrary to both the Securities and Exchange Commission's (SEC) position in a recent Ninth Circuit case[2] and our holding in *Basic Inc.* v. *Levinson,* 485 U. S. 224 (1988). These two points merit separate discussion.

I

The Court of Appeals incorrectly based its decision on the view that "[a] device or contrivance is not 'deceptive,' within the meaning of §10(b), absent some misstatement or a failure to disclose by one who has a duty to disclose." *In re Charter Communications, Inc., Securities Litigation,* 443 F. 3d 987, 992 (CA8 2006). The Court correctly explains why the statute covers nonverbal as well as verbal deceptive conduct. *Ante*, at 7. The allegations in this case—that respondents produced documents falsely claim-

_____

[1] See *ante*, at 10 ("[w]ere the implied cause of action to be extended to the practices described here . . . "); *ante*, at 12 ("[t]he practical consequences of an expansion"); *ante*, at 14 ("Concerns with the judicial creation of a private cause of action caution against its expansion. The decision to extend the cause of action is for the Congress, not for us").

[2] See Brief for SEC as *Amicus Curiae* in *Simpson* v. *AOL Time Warner Inc.*, No. 04–55665 (CA9), p. 21 ("The reliance requirement is satisfied where a plaintiff relies on a material deception flowing from a defendant's deceptive act, even though the conduct of other participants in the fraudulent scheme may have been a subsequent link in the causal chain leading to the plaintiff's securities transaction").

ing costs had risen and signed contracts they knew to be backdated in order to disguise the connection between the increase in costs and the purchase of advertising—plainly describe "deceptive devices" under any standard reading of the phrase.

What the Court fails to recognize is that this case is critically different from *Central Bank* because the bank in that case did not engage in any deceptive act and, therefore, did not *itself* violate §10(b). The Court sweeps aside any distinction, remarking that holding respondents liable would "revive in substance the implied cause of action against all aiders and abettors except those who committed no deceptive act in the process of facilitating the fraud." *Ante*, at 11–12. But the fact that Central Bank engaged in no deceptive conduct whatsoever—in other words, that it was at most an aider and abettor—sharply distinguishes *Central Bank* from cases that do involve allegations of such conduct. 511 U. S., at 167 (stating that the question presented was "whether private civil liability under §10(b) extends as well to those who do not engage in the manipulative or deceptive practice, but who aid and abet the violation").

The Central Bank of Denver was the indenture trustee for bonds issued by a public authority and secured by liens on property in Colorado Springs. After default, purchasers of $2.1 million of those bonds sued the underwriters, alleging violations of §10(b); they also named Central Bank as a defendant, contending that the bank's delay in reviewing a suspicious appraisal of the value of the security made it liable as an aider and abettor. *Id.*, at 167–168. The facts of this case would parallel those of *Central Bank* if respondents had, for example, merely delayed sending invoices for set-top boxes to Charter. Conversely, the facts in *Central Bank* would mirror those in the case before us today if the bank had knowingly purchased real estate in wash transactions at above-market prices in

order to facilitate the appraiser's overvaluation of the security. *Central Bank*, thus, poses no obstacle to petitioner's argument that it has alleged a cause of action under §10(b).

## II

The Court's next faulty premise is that petitioner is required to allege that Scientific-Atlanta and Motorola made it "necessary or inevitable for Charter to record the transactions as it did," *ante*, at 10, in order to demonstrate reliance. Because the Court of Appeals did not base its holding on reliance grounds, see 443 F. 3d, at 992, the fairest course to petitioner would be for the majority to remand to the Court of Appeals to determine whether petitioner properly alleged reliance, under a correct view of what §10(b) covers.[3] Because the Court chooses to rest its holding on an absence of reliance, a response is required.

In *Basic Inc.,* 485 U. S., at 243, we stated that "[r]eliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." The Court's view of the causation required to demonstrate reliance is unwarranted and without precedent.

In *Basic Inc.*, we held that the "fraud-on-the-market" theory provides adequate support for a presumption in private securities actions that shareholders (or former

––––––––––

[3] Though respondents did argue to the Court of Appeals that reliance was lacking, see Brief for Appellee Motorola, Inc., in No. 05–1974 (CA8), p. 15, that argument was quite short and was based on an erroneously broad reading of *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164 (1994), as discussed, *supra*, at 3 and this page. The Court of Appeals mentioned reliance only once, stating that respondents "did not issue any misstatement relied upon by the investing public." 443 F. 3d, at 992. Furthermore, that statement was made in the context of the Court of Appeals' holding that a deceptive act must be a misstatement or omission—a holding which the Court unanimously rejects.

shareholders) in publicly traded companies rely on public material misstatements that affect the price of the company's stock. *Id.*, at 248. The holding in *Basic* is surely a sufficient response to the argument that a complaint alleging that deceptive acts which had a material effect on the price of a listed stock should be dismissed because the plaintiffs were not subjectively aware of the deception at the time of the securities' purchase or sale. This Court has not held that investors must be aware of the specific deceptive act which violates §10b to demonstrate reliance.

The Court is right that a fraud-on-the-market presumption coupled with its view on causation would not support petitioner's view of reliance. The fraud-on-the-market presumption helps investors who cannot demonstrate that they, *themselves*, relied on fraud that reached the market. But that presumption says nothing about causation from the other side: what an individual or corporation must do in order to have "caused" the misleading information that reached the market. The Court thus has it backwards when it first addresses the fraud-on-the-market presumption, rather than the causation required. See, *ante*, at 8. The argument is not that the fraud-on-the-market presumption is enough standing alone, but that a correct view of causation coupled with the presumption would allow petitioner to plead reliance.

Lower courts have correctly stated that the causation necessary to demonstrate reliance is not a difficult hurdle to clear in a private right of action under §10(b). Reliance is often equated with "'transaction causation.'" *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U. S. 336, 341, 342 (2005). Transaction causation, in turn, is often defined as requiring an allegation that but for the deceptive act, the plaintiff would not have entered into the securities transaction. See, *e.g.*, *Lentell* v. *Merrill Lynch & Co.*, 396 F. 3d 161, 172 (CA2 2005); *Binder* v. *Gillespie*, 184 F. 3d 1059, 1065–1066 (CA9 1999).

Even if but-for causation, standing alone, is too weak to establish reliance, petitioner has also alleged that respondents proximately caused Charter's misstatement of income; petitioner has alleged that respondents knew their deceptive acts would be the basis for statements that would influence the market price of Charter stock on which shareholders would rely. Second Amended Consolidated Class Action Complaint ¶¶ 8, 98, 100, 109, App. 19a, 55a–56a, 59a. Thus, respondents' acts had the foreseeable effect of causing petitioner to engage in the relevant securities transactions. The Restatement (Second) of Torts §533, pp. 72–73 (1977), provides that "[t]he maker of a fraudulent misrepresentation is subject to liability . . . if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other." The sham transactions described in the complaint in this case had the same effect on Charter's profit and loss statement as a false entry directly on its books that included $17 million of gross revenues that had not been received. And respondents are alleged to have known that the outcome of their fraudulent transactions would be communicated to investors.

The Court's view of reliance is unduly stringent and unmoored from authority. The Court first says that if the petitioner's concept of reliance is adopted the implied cause of action "would reach the whole marketplace in which the issuing company does business." *Ante*, at 9. The answer to that objection is, of course, that liability only attaches when the company doing business with the issuing company has *itself* violated §10(b).[4] The Court next relies on

—————

[4] Because the kind of sham transactions alleged in this complaint are unquestionably isolated departures from the ordinary course of business in the American marketplace, it is hyperbolic for the Court to conclude that petitioner's concept of reliance would authorize actions "against the entire marketplace in which the issuing company oper-

what it views as a strict division between the "realm of
financing business" and the "ordinary business operations."
*Ante*, at 10. But petitioner's position does not merge the
two: A corporation engaging in a business transaction with
a partner who transmits false information to the market is
only liable where the corporation *itself* violates §10(b).
Such a rule does not invade the province of "ordinary"
business transactions.

The majority states that "[s]ection 10(b) does not incor-
porate common-law fraud into federal law," citing *SEC* v.
*Zandford*, 535 U. S. 813 (2002). *Ante*, at 11. Of course,
not every common-law fraud action that happens to touch
upon securities is an action under §10(b), but the Court's
opinion in *Zandford* did not purport to jettison all refer-
ence to common-law fraud doctrines from §10(b) cases. In
fact, our prior cases explained that to the extent that "the
antifraud provisions of the securities laws are not coexten-
sive with common-law doctrines of fraud," it is because
common-law fraud doctrines might be too restrictive.
*Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 388–
389 (1983). "Indeed, an important purpose of the federal
securities statutes was to rectify perceived deficiencies in
the available common-law protections by establishing
higher standards of conduct in the securities industry."
*Id.,* at 389. I, thus, see no reason to abandon common-law
approaches to causation in §10(b) cases.

Finally, the Court relies on the course of action Con-
gress adopted after our decision in *Central Bank* to argue
that siding with petitioner on reliance would run contrary
to congressional intent. Senate hearings on *Central Bank*
were held within one month of our decision.[5] Less than
one year later, Senators Dodd and Domenici introduced
S. 240, which became the Private Securities Litigation

_____

ates." *Ante,* at 11.

[5] See S. Rep. No. 104–98, p. 2 (1995) (hereinafter S. Rep.).

Reform Act of 1995 (PSLRA), 109 Stat. 737.[6]  Congress stopped short of undoing *Central Bank* entirely, instead adopting a compromise which restored the authority of the SEC to enforce aiding and abetting liability.[7]  A private right of action based on aiding and abetting violations of §10(b) was not, however, included in the PSLRA,[8] despite support from Senator Dodd and members of the Senate Subcommittee on Securities.[9]  This compromise surely provides no support for extending *Central Bank* in order to immunize an undefined class of actual violators of §10(b) from liability in private litigation.  Indeed, as Members of Congress—including those who rejected restoring a private cause of action against aiders and abettors—made clear, private litigation under §10(b) continues to play a vital role in protecting the integrity of our securities markets.[10]  That Congress chose not to restore the aiding and

––––––––––

[6] *Id.*, at 1.

[7] The opinion in *Central Bank* discussed only private remedies, but its rationale—that the text of §10(b) did not cover aiding and abetting— obviously limited the authority of public enforcement agencies.  See 511 U. S., at 199–200 (STEVENS, J., dissenting); see also S. Rep., at 19 ("The Committee does, however, grant the SEC express authority to bring actions seeking injunctive relief or money damages against persons who knowingly aid and abet primary violators of the securities laws").

[8] PSLRA, §104, 109 Stat. 757; see also S. Rep., at 19 ("The Committee believes that amending the 1934 Act to provide explicitly for private aiding and abetting liability actions under Section 10(b) would be contrary to S. 240's goal of reducing meritless securities litigation").

[9] See *id.*, at 51 (additional views of Sen. Dodd) ("I am pleased that the Committee bill grants the Securities and Exchange Commission explicit authority to bring actions against those who knowingly aid and abet primary violators.  However, I remain concerned about liability in private actions and will continue work with other Committee members on this issue as we move to floor consideration").  Senators Sarbanes, Boxer, and Bryan also submitted additional views in which they stated that "[w]hile the provision in the bill is of some help, the deterrent effect of the securities laws would be strengthened if aiding and abetting liability were restored in private actions as well."  *Id.*, at 49.

[10] *Id.*, at 8 ("The success of the U. S. securities markets is largely the

abetting liability removed by *Central Bank* does not mean that Congress wanted to exempt from liability the broader range of conduct that today's opinion excludes.

The Court is concerned that such liability would deter overseas firms from doing business in the United States or "shift securities offerings away from domestic capital markets." *Ante,* at 13. But liability for those who violate §10(b) "will not harm American competitiveness; in fact, investor faith in the safety and integrity of our markets *is* their strength. The fact that our markets are the safest in the world has helped make them the strongest in the world." Brief for Former SEC Commissioners as *Amici Curiae* 9.

Accordingly, while I recognize that the *Central Bank* opinion provides a precedent for judicial policymaking decisions in this area of the law, I respectfully dissent from the Court's continuing campaign to render the private cause of action under §10(b) toothless. I would re-

———————

result of a high level of investor confidence in the integrity and efficiency of our markets. The SEC enforcement program and the availability of private rights of action together provide a means for defrauded investors to recover damages and a powerful deterrent against violations of the securities laws"); see also *Bateman Eichler, Hill Richards, Inc.* v. *Berner*, 472 U. S. 299, 310 (1985) ("Moreover, we repeatedly have emphasized that implied private actions provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to Commission action'"); Brief for Former SEC Commissioners as *Amici Curiae* 4 ("[L]iability [of the kind at issue here] neither results in undue liability exposure for non-issuers, nor an undue burden upon capital formation. Holding liable wrongdoers who actively engage in fraudulent conduct that lacks a legitimate business purpose does not hinder, but rather enhances, the integrity of our markets and our economy. We believe that the integrity of our securities markets is their strength. Investors, both domestic and foreign, trust that fraud is not tolerated in our nation's securities markets and that strong remedies exist to deter and protect against fraud and to recompense investors when it occurs").

verse the decision of the Court of Appeals.

## III

While I would reverse for the reasons stated above, I must also comment on the importance of the private cause of action that Congress implicitly authorized when it enacted the Securities Exchange Act of 1934. A theme that underlies the Court's analysis is its mistaken hostility towards the §10(b) private cause of action.[11]  *Ante,* at 13. The Court's current view of implied causes of action is that they are merely a "relic" of our prior "heady days." *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 75 (2001) (SCALIA, J., concurring). Those "heady days" persisted for two hundred years.

During the first two centuries of this Nation's history much of our law was developed by judges in the common-law tradition. A basic principle animating our jurisprudence was enshrined in state constitution provisions guaranteeing, in substance, that "every wrong shall have a remedy."[12]  Fashioning appropriate remedies for the viola-

_____

[11] The Court does concede that Congress has now ratified the private cause of action in the PSLRA. See *ante*, at 15.

[12] Today, the guarantee of a remedy for every injury appears in nearly three-quarters of state constitutions. Ala. Const., Art. I, §13; Ark. Const., Art. II, §13; Colo. Const., Art. II, §6; Conn. Const., Art. I, §10; Del. Const., Art. I, §9; Fla. Const., Art. I, §21; Idaho Const., Art. I, §18; Ill. Const., Art. I, §12; Ind. Const., Art. I, §12; Kan. Const., Bill of Rights, §18; Ky. Const., §14; La. Const., Art. I, §22; Me. Const., Art. I, §19; Md. Const., Declaration of Rights, Art. 19; Mass. Const., pt. I, Art. 11; Minn. Const., Art. 1, §8; Miss. Const., Art. III, §24; Mo. Const., Art. I, §14; Mont. Const., Art. II, §16; Neb. Const., Art. I, §13; N. H. Const., pt. I, Art. 14; N. C. Const., Art. I, §18; N. D. Const., Art. I, §9; Ohio Const., Art. I, §16; Okla. Const., Art. II, §6; Ore. Const., Art. I, §10; Pa. Const., Art. I, §11; R. I. Const., Art. I, §5; S. C. Const., Art. I, §9; S. D. Const., Art. VI, §20; Tenn. Const., Art. I, §17; Tex. Const., Art. I, §13; Utah Const., Art. I, §11; Vt. Const., ch. I, Art. 4; W. Va. Const., Art. III, §17; Wis. Const., Art. I, §9; Wyo. Const., Art. I, §8; see also Phillips, The Constitutional Right to a Remedy, 78 N. Y. U. L. Rev. 1309, 1310, n. 6 (2003) (hereinafter Phillips).

tion of rules of law designed to protect a class of citizens was the routine business of judges. See *Marbury* v. *Madison*, 1 Cranch 137, 166 (1803). While it is true that in the early days state law was the source of most of those rules, throughout our history—until 1975—the same practice prevailed in federal courts with regard to federal statutes that left questions of remedy open for judges to answer. In *Texas & Pacific R. Co.* v. *Rigsby*, 241 U. S. 33, 39 (1916), this Court stated the following:

> "A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law expressed in 1 Com. Dig., *tit.* Action upon Statute (F), in these words: 'So, in every case, where a statute enacts, or prohibits a thing for the benefit of a person, he shall have a remedy upon the same statute for the thing enacted for his advantage, or for the recompense of a wrong done to him contrary to the said

―――――――
The concept of a remedy for every wrong most clearly emerged from Sir Edward Coke's scholarship on Magna Carta. See 1 Second Part of the Institutes of the Laws of England (1797). At the time of the ratification of the United States Constitution, Delaware, Massachusetts, Maryland, New Hampshire, and North Carolina had all adopted constitutional provisions reflecting the provision in Coke's scholarship. Del. Declaration of Rights and Fundamental Rules §12 (1776), reprinted in 2 W. Swindler, Sources and Documents of United States Constitutions 198 (1973) (hereinafter Swindler); Mass. Const., pt. I, Art. XI (1780), reprinted in 3 Federal and State Constitutions, Colonial Charters, and Other Organic Laws 1891 (F. Thorpe ed. 1909) (reprinted 1993) (hereinafter Thorpe); Md. Const., Declaration of Rights, Art. XVII (1776), in *id.*, at 1688; N. H. Const., Art. XIV (1784), in 4 *id.*, at 2455; N. C. Const., Declaration of Rights, Art. XIII (1776), in 5 *id.*, at 2787, 2788; see also Phillips 1323–1324. Pennsylvania's Constitution of 1790 contains a guarantee. Pa. Const., Art. IX, §11, in 5 Thorpe 3101. Connecticut's 1818 Constitution, Art. I, §12, contained such a provision. Reprinted in Swindler 145.

law.' (*Per* Holt, C. J., *Anon.*, 6 Mod. 26, 27.)"

Judge Friendly succinctly described the post-*Rigsby*, pre-1975 practice in his opinion in *Leist* v. *Simplot*, 638 F. 2d 283, 298–299 (CA2 1980):

> "Following *Rigsby* the Supreme Court recognized implied causes of action on numerous occasions, see, e.g., *Wyandotte Transportation Co. v. United States*, 389 U.S. 191 . . . (1967) (sustaining implied cause of action by United States for damages under Rivers and Harbors Act for removing negligently sunk vessel despite express remedies of *in rem* action and criminal penalties); *United States v. Republic Steel Corp.*, 362 U.S. 482 . . . (1960) (sustaining implied cause of action by United States for an injunction under the Rivers and Harbors Act); *Tunstall* v. *Locomotive Firemen & Enginemen*, 323 U.S. 210 . . . (1944) (sustaining implied cause of action by union member against union for discrimination among members despite existence of Board of Mediation); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229 . . . (1969) (sustaining implied private cause of action under 42 U.S.C. §1982); *Allen v. State Board of Elections*, 393 U.S. 544 . . . (1969) (sustaining implied private cause of action under §5 of the Voting Rights Act despite the existence of a complex regulatory scheme and explicit rights of action in the Attorney General); and, of course, the aforementioned decisions under the securities laws. As the Supreme Court itself has recognized, the period of the 1960's and early 1970's was one in which the 'Court had consistently found implied remedies.' *Cannon v. University of Chicago*, 441 U.S. 677, 698 . . . (1979)."

In a law-changing opinion written by Justice Brennan in 1975, the Court decided to modify its approach to private causes of action. *Cort* v. *Ash,* 422 U. S. 66 (constraining courts to use a strict four-factor test to determine whether

Congress intended a private cause of action). A few years later, in *Cannon* v. *University of Chicago,* 441 U. S. 677 (1979), we adhered to the strict approach mandated by *Cort* v. *Ash* in 1975, but made it clear that "our evaluation of congressional action in 1972 must take into account its contemporary legal context." 441 U. S., at 698–699. That context persuaded the majority that Congress had intended the courts to authorize a private remedy for members of the protected class.

Until *Central Bank,* the federal courts continued to enforce a broad implied cause of action for the violation of statutes enacted in 1933 and 1934 for the protection of investors. As Judge Friendly explained:

> "During the late 1940's, the 1950's, the 1960's and the early 1970's there was widespread, indeed almost general, recognition of implied causes of action for damages under many provisions of the Securities Exchange Act, including not only the antifraud provisions, §§ 10 and 15(c)(1), see *Kardon v. National Gypsum Co.*, 69 F.Supp. 512, 513–14 (E.D.Pa.1946); *Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783, 787 (2 Cir. 1951) (Frank, J.); *Fratt v. Robinson*, 203 F.2d 627, 631–33 (9 Cir. 1953), but many others. These included the provision, § 6(a)(1), requiring securities exchanges to enforce compliance with the Act and any rule or regulation made thereunder, see *Baird v. Franklin*, 141 F.2d 238, 239, 240, 244–45 (2 Cir.), *cert. denied*, 323 U.S. 737 . . . (1944), and provisions governing the solicitation of proxies, see *J. I. Case Co. v. Borak*, 377 U.S. 426, 431–35 . . . (1964). . . . Writing in 1961, Professor Loss remarked with respect to violations of the antifraud provisions that with one exception 'not a single judge has expressed himself to the contrary.' 3 Securities Regulation 1763–64. See also Bromberg & Lowenfels, *supra,* §2.2 (462) (describing

1946–1974 as the 'expansion era' in implied causes of action under the securities laws).  When damage actions for violation of §10(b) and Rule 10b–5 reached the Supreme Court, the existence of an implied cause of action was not deemed worthy of extended discussion.  *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6 . . . (1971)." *Leist*, 638 F. 2d, at 296–297 (footnote omitted).

In light of the history of court-created remedies and specifically the history of implied causes of action under §10(b), the Court is simply wrong when it states that Congress did not impliedly authorize this private cause of action "when it first enacted the statute." *Ante*, at 16. Courts near in time to the enactment of the securities laws recognized that the principle in *Rigsby* applied to the securities laws.[13]  Congress enacted §10(b) with the understanding that federal courts respected the principle that every wrong would have a remedy.  Today's decision simply cuts back further on Congress' intended remedy.  I respectfully dissent.

---

[13] See, *e.g.*, *Slavin* v. *Germantown Fire Ins. Co.*, 174 F. 2d 799 (CA3 1949); *Baird* v. *Franklin*, 141 F. 2d 238, 244–245 (CA2) ("The fact that the statute provides no machinery or procedure by which the individual right of action can proceed is immaterial.  It is well established that members of a class for whose protection a statutory duty is created may sue for injuries resulting from its breach and that the common law will supply a remedy if the statute gives none"), cert. denied, 323 U. S. 737 (1944); *Kardon* v. *National Gypsum Co.*, 69 F. Supp. 512, 514 (ED Pa. 1946) ("[T]he right to recover damages arising by reason of violation of a statute . . . is so fundamental and so deeply ingrained in the law that where it is not expressly denied the intention to withhold it should appear very clearly and plainly").